8.94 **Twelfth**. The Fair Debt Collection Practices Act must be adhered to in California, as in all other jurisdictions in the United States and the United States of America.

8.95 If a debt cannot be validated by the creditor, it is unenforceable and the creditor must cease and desist all collection activities pursuant to Title 15 USC § 1692(g). A notice by the debtor that the debt is being disputed is all that is needed to compel the creditor to stop collecting the debt until debt validation has been completed. See *Clarks Jeweler's v. Humble*, 823 P.2d 818, 16 Kan.App.2d 366 (1991). Furthermore, all collection agencies and debt collectors include a clause in their collection notices, which is a notice to the debtor that the debt collector is attempting to collect a debt.

8.96 This provides tacit acknowledgment that the debt collectors must comply with Title 15, § 1692 et seq. The debt collectors cannot identify anything of substance or value loaned in the transaction and therefore cannot validate the debt. Be advised that "verification" is defined (in Black's Law Dictionary, Sixth Edition) as follows: "Confirmation of correctness, truth, or authenticity by affidavit, oath, or deposition. Affidavit of truth of matter stated and object of verification is to assure good faith in averments or statements of party."

8.97 THE DEBT HAS BEEN SOLD TO A THIRD PARTY, THEREFORE THE DEFENDANTS CANNOT CLAIM TO BE THE ACTUAL CREDITOR, THEY ARE A DEBT COLLECTOR, AND THUS THE FAIR DEBT COLLECTION PRACTICES ACT HAS FORCE AND EFFECT ON THEM.

8.98 **Thirteenth**. WASHINGTON MUTUAL BANK has no right to lend credit as this is a violation of their corporate charter and violates Federal law, and is prohibited under the doctrine of *ultra vires*.

8.99 The United States Supreme Court and the lower courts have long recognized that the banks cannot loan credit.

"In the federal courts, it is well established that a national bank has not power to lend its credit to another by becoming surety, indorser, or guarantor for him."

See *Farmers and Miners Bank v. Bluefield Nat 'l Bank*, 11 F.2d 83, 271 U.S. 669.

8.100 **Fourteenth**. A party alleging to be creditor must prove standing. The Defendants have failed or refused to produce the actual note, which the Defendants alleges that Plaintiffs owe. Where the foreclosing party cannot prove the existence of the note, then there is no note. As a result, the Defendants, and each of them, lack standing to enforce the bank loan, which was entered into by Plaintiffs with WASHINGTON MUTUAL BANK, for the purchase of the subject land and buildings, the subject property. To recover on a promissory note, the Defendant must prove: (1) the existence of the note in question; (2) that the party sued signed the note; (3) that the Defendant is the owner or holder of the note; and (4) that a certain balance is due and owing on the note. See *In re SMS Financial LLC. v. Abco Homes, Inc.*, No.98-50117 February 18, 1999 (CA5 1999). See also Restatement, Contracts §§ 170(3), (4) (1932); C.J.S. Mortgages § 469.

8.101 In *Carnegie Bank v Shalleck*, 256 N.J. Super 23 (App. Div 1992), the Appellate Division held, "When the underlying mortgage is evidenced by an instrument meeting the criteria for negotiability set forth in N.J.S. 12A:3-104, the holder of the instrument shall be afforded all the rights and protections provided a holder in due course pursuant to N.J.S. 12A:3-302." Since no one is able to produce the "instrument" there is no competent evidence before the Court that any party is the holder of the alleged note or the true holder in due course.

8.102 New Jersey common law dictates that the plaintiff prove the existence of the alleged note in question, prove that the party sued signed the alleged note, prove that the plaintiff is the owner and holder of the alleged note, and prove that a certain balance is due and owing on any alleged note." Federal Circuit Courts have ruled that the only way to prove the perfection of any security is by actual possession of the security. See *Matter of Staff Mortg. & Inv. Corp.*, 550 F.2d 1228 (9th Cir. 1977):

> "Under the Uniform Commercial Code, the only notice sufficient to inform all interested parties that a security interest in instruments has been perfected is actual possession by the secured party, his agent or bailee." The above Ninth Circuit ruling was affirmed six times by the Ninth Circuit Court of Appeals and similar rulings were handed down in the Eighth and Sixth Circuits. Bankruptcy Courts have followed the Uniform Commercial Code. *In Re Investors & Lenders, Ltd.* 165 B.R. 389 (Bkrtcy.D.N.J.1994), "Under the New Jersey Uniform Commercial Code (NJUCC), promissory note is "instrument," security interest in which must be perfected by possession."

8.103 The right to enforce the mortgage on behalf of the note holder does not, however, render the note holder's agent into the real party in interest. "As a general rule, a person who is an attorney-in-fact or an agent solely for the purpose of bringing suit is viewed as a nominal rather than a real party in interest and will be required to litigate in the name of his principal rather than in his own name." *Wright & Miller*, 6A Federal Practice & Procedure Civ.2d § 1553. Consequently, even if a court finds that a proper agency relationship exists between the holder of a note and the party seeking to enforce its security, this does not excuse the agent from the requirement that an action be prosecuted in the name of the note holder, who is the real party in interest. Fed.R.Civ.P. 17(a)(1)"See *In re Hwang*, 396 B.R. 757 (Bankr. C.D. Cal. Sept. 2008).

8.104 **Fifteenth**. In order to prove damages in foreclosure of a debt, a party must enter the account and general ledger statement into the record through a competent fact witness.

8.105 To prove up a claim of damages, the foreclosing party must enter evidence incorporating records such as a general ledger and accounting of an alleged unpaid promissory note, the person responsible for preparing and maintaining the account general ledger must provide a complete accounting which must be sworn to and dated by the person who maintained the ledger. See *Pacific Concrete F.C.U. V. Kauanoe*, 62 Haw. 334, 614 P.2d 936 (1980), *GE Capital Hawaii, Inc. v. Yonenaka*, 25 P.3d 807, 96 Hawaii 32, (Hawaii App 2001); *Fooks v. Norwich Housing Authority*, 28 Conn.L.Rptr. 371, (Conn. Super.2000); *Town of Brookfield v. Candlewood Shores Estates, Inc.*, 513 A.2d 1218, 201 (1986); *Solon v. Godbole*, 163 Ill.App.3d 845.

8.106 **Sixteenth**. The Defendants including, JP MORGAN CHASE BANK, NA, and their predecessor-in-interest, has not incurred a financial loss in the lending of Federal Reserve Notes.

8.107 **Exhibit** C proves the factual lack of any financial loss or any assets of the alleged creditor pledged in the transaction. As anyone reviewing this can see, the banks in the United States of America create money at no cost to themselves. Please see page 23 Question number 125. The statement by the House Banking Committee is as follows; "The business of banks is to lend money. The profit comes from the difference between the cost of creating money and the price they charge borrowers for that money. Now the cost of creating money is negligible.

Congress has delegated the power to create money to the banking system without a charge. The banks do not pay a license fee or a payment charge for their reserves. Thus the raw materials the banks use cost them nothing." (Emphasis added.) Thus the Defendants including, JP MORGAN CHASE BANK, NA, cannot allege that they incurred a financial loss, and they have no standing to assert a financial loss or foundation to allege that they incurred a financial loss, based upon the above statement issued by the House Banking Committee.

8.108 We, Lawrence Munar Asuncion and Maria Estrella C. Asuncion, the Plaintiffs are aware and allege that the Defendants believe that they have an exclusive right, title and interest in the subject property, which is adverse to my interest, as Plaintiff, and that they do not have said right, title and interest, based upon the elements of fraud and failure of consideration, lack of the right of subrogation, and the unlawful collateral attack on patented land. The claims of the Defendants and each of them are without any rights whatsoever, and the Defendants have absolutely no legal or equitable estate, right, title or interest in the subject land and buildings that is the subject of this complaint.

8.109 We, Lawrence Munar Asuncion and Maria Estrella C. Asuncion, the Plaintiffs, hereby seek a declaration that the exclusive title to the subject land and buildings, the subject property must be and is vested in the Plaintiff and that the Defendants herein, and each of them be declared to have no estate, right, title or interest, whatsoever, in the subject land and buildings that is the subject of this complaint. I further seek a court order that the Defendants herein, and each of them cease and desist any and all actions to assert any right, title or interest or possession in the subject land and buildings, and disclaim any right, title and interest in the subject land and buildings.

8.110 Plaintiff's made a good faith offer of performance to pay the amount of money the Defendant, JP MORGAN CHASE BANK, NA, and CHASE HOME FINANCE, LLC. said that I owe up to and including the full amount of the alleged debt, along with a condition precedent, which the law allows, See **Exhibit** G. Under California law if the offer of performance is not accepted the obligation is extinguished and this qualifies as tender of payment under California law.

8.111 Note: "A tender is an offer of performance, made with the intent to extinguish the obligation (Civil Code § 1485) When properly made, it has the effect of putting the other party in default if he refuses to accept it ," See *Wiesenberg v. Hirshorn*, 97 Cal App. 532, 275 P. 997; *Lovetro V. Steers*, 234 Cal App.2d 461, 44 Cal.Rptr. 604; *Holland v. Paddock*, 142 Cal.App.2d 534, 298 P.2d 587. "Any tender of performance, including the exercise of an option, is ineffective if it imposes conditions upon its acceptance which the offeror is not entitled to demand." Civil Code Sec. 1494; *Schiffner v. Pappas*, 1963 223 Cal.App.2d 526, 35 Cal Rptr. 817.

8.112 However, the imposition of such conditions is waived by the offeree if he does not specifically point out the alleged defects in the tender. Civil Code §§ 1501, 2076; *Hohener v. Gauss* (1963) 221 Cal. App.2d 797, 34 Cal. Rptr. 656. "The rationale of the requirement of specific objection is that the offeror should be permitted to remedy any defects in his tender; the offeree is therefore not allowed to remain silent at the time of the tender and later surprise the offeror with hidden objections." See *Thomassen v. Carr*, (1967) 250 Cal. App. 2d 341, 350, 58 Cal Rptr. 297; *Riverside Fence Co. v. Novak*, (1969) 78 Cal. Rptr. 536. "A tender need not be kept good when it appears that it will not be accepted." See *Hossom v. City of Long Beach*, ( 1948) 189 P. 2d 787, 83 C.A. 2d 745.

> "By Failure to object to a tender as to the mode of the offer, the party to whom the tender is made waives the grounds of the objections which he had an opportunity to state at the time and which could have then been obviated by the tenderer."

See *Smith v. Central & Pacific Imp. Corp.*, (1919) 187 P. 456, 45 C.A. 384.

8.113 This offer was made pursuant to the California Civil Code § 1485 as follows: "1485. OBLIGATION EXTINGUISHED BY OFFER OF PERFORMANCE. An obligation is extinguished by an offer of performance, made in conformity to the rules herein prescribed, and with intent to extinguish the obligation." (Enacted 1872), and California Code of Civil Procedure, § 2074, as follows: "2074 OFFER TO PAY OR DELIVER AS EQUIVALENT TO

ACTUAL TENDER, An offer in writing to pay a particular sum of money, or to deliver a written instrument or specific personal property, is if not accepted, equivalent to the actual production and tender of the money, instrument, or property. (Enacted 1872)."

8.114 The Offer of Performance stated as follows: Pursuant to California Civil Code, § 1498, the offer to pay the amount of any money that is lawfully due, up to and including the amount of $ 1,180,000.00 they said Plaintiff's owed was made to dependent upon performance of condition precedent to which I am entitled by the fundamental principles of American Jurisprudence and law, namely: A. presentation of evidence sufficient to demonstrate that the obligation for me to pay this amount, if such exits arises by either: 1. Operation of Law, or; 2. Contract of the Parties, and; B.

8.115 If the Obligation is created by a promissory note and deed of trust, presentation of the original promissory note which demonstrates that JP MORGAN CHASE BANK, NA is the holder-in-due-course of the promissory note or acting on behalf of someone who has possession of the promissory note and deed of trust and that they or the note holder bring forward the original promissory note with an endorsement stamp that the note has been endorsed over to the party claiming to be the note holder and beneficiary demonstrating that the note is in their or their possession pursuant to California Commercial Code §§ 1201(b)(21)(A), 3309, 3301, and 3305 and *Matter of Staff Mortg. & Inv. Co.*, 550 F 2d 1228, (Ninth Circuit, 1977) and that they or the note holder have recorded an assignment of the deed of trust as required under California Civil Code § 2932.5. Plaintiff's also required, as a condition precedent, that Defendants (1.) validate the debt and (2.) demonstrate that the Defendants are requesting payment of debt in legal tender that conforms to the requirements under all provisions of the US Constitution.

8.116 California Civil Code, § 1498 states the following: "1498. PERFORMANCE OF CONDITION PRECEDENT. When a debtor is entitled to the performance of a condition precedent to, or concurrent with, performance on his part, he may make his offer to depend upon the due performance of such condition." ( Enacted 1872 ) It should be noted that California Civil Code § 1501 provides the authority for me to expect and require that if JP MORGAN CHASE BANK, NA has any objection to the mode of this offer, it must immediately state that objection as follows: "1501. OBJECTIONS TO MODE OF OFFER. All objections to the mode of an offer of performance, which the creditor has an opportunity to state at the time to the person making the offer, and which could then be obviated by him, are waived by the creditor, if not then stated."

8.117 And California Code of Civil Procedure, § 2076 as follows: "2076. OBJECTIONS TO TENDER MUST BE SPECIFIED. the person to whom a tender is made, must, at the time, specify any objection he may have to the money, instrument, or property, or he must be deemed to have waived it: and if the objection be to the amount of money, the terms of the instrument, or the amount or kind of property he must specify the amount, terms or kind which he requires, or be precluded from objecting afterward."

### THIRD CAUSE OF ACTION.

(Slander of Title, fraudulent inducement)

8.118 We, Lawrence Munar Asuncion and Maria Estrella C. Asuncion, the Plaintiff's hereby allege and re-allege all of the foregoing Paragraphs as part of this Cause of Action with the same force and effect as if fully set forth herein. Based upon the foregoing the Defendants are slandering title to the subject property, and are attempting an act of theft of private property.

8.119 The Defendants have a duty to refrain from attempting to foreclose when Defendants lack the right of subrogation. Plaintiff's ask the court to provide declaratory relief to order the Defendants to cease and desist and declare null and void the foreclosure notices, abate, curtail, cease and desist any collection activities by the Defendants for lack of due process lack of a claim filed against the original land patent, and breach of contract.

8.120 The Defendants, and each of them, including JP MORGAN CHASE BANK, NA's principal, The Mortgage backed Security (or their undisclosed third party note holder), have not produced any evidence whatsoever that the Defendants are holding the original notes and have not produced evidence that the Defendants are a co-signer on the original promissory notes. The Defendants, and each of them, including JP MORGAN CHASE BANK, NA's principal, have, therefore, no right of subrogation and no right to foreclose on the subject property.

8.121 The Defendants and each of them, have never produced any evidence that the Undisclosed Third Party Note Buyer has paid the entire mortgage debt in full, thereby failing to prove a second element that is required of someone who is claiming to have a right of subrogation, as discussed above. The Defendants and each of them, therefore, have no right of

subrogation as a stranger to the original transaction and as someone who has not paid the entire mortgage debt in full. See Aetna L. Ins. Co. v. Middleport, 124 US 534.

8.122 In an action to annul a promissory note and deed of trust which were then in the hands of an assignee, evidence supported findings that foreclosure during litigation would produce great or irreparable injury to the Plaintiffs and therefore issuance of an order of cease and desist restraining assignees from disposing of a note and deed or from foreclosing was not an abuse of discretion. See *Daniels v. Williams*, 270 P. 2d 556, 125 C.A. 2d 310. In this case Plaintiff's are asking for an order to cease and desist. Plaintiff's will suffer irreparable harm, the loss of Plaintiff's home, if the court does not restrain the Defendants from their unlawful actions by way of an order of cease and desist.

8.123 **Second**. The Defendants have never produced the following; A.) evidence of a lien, a security interest or some kind of right, title or interest in the property or any sort of claim that is superior to our own, based upon a right of subrogation and upon valuable consideration and a judgment by a common law court, WHICH IS REQUIRED UNDER CALIFORNIA LAW PURSUANT TO THE FIFTH AND SEVENTH AMENDMENTS TO THE US CONSTITUTION PRIOR TO ANY ATTEMPT TO SELL THE PROPERTY; This is also required by the rules of the common law, pursuant to the Seventh Amendment, see *443 Cans of Frozen Egg Product v United States of America*, *supra*, and the Northwest Ordinance of 1787; and B.) to identify the valuable consideration or lawful money that gives them power to enforce the original mortgage contract.

8.124 Therefore, under the doctrine of laches the Defendants are barred from now claiming to have a right of subrogation and thereby any right, title or interest in the property or a lien or a security interest over Plaintiff's, We, Lawrence Munar Asuncion and Maria Estrella C. Asuncion, the Plaintiffs, or our private property described in **Exhibit** A. Under the principal of estoppel by silence, the Defendants remain silent and still do not respond to the constructive notice or issues of law raised in the constructive notice.

1

### FOURTH CAUSE OF ACTION.

2

(Fraudulent Concealment)

3

8.125 We, Lawrence Munar Asuncion and Maria Estrella C. Asuncion, the Plaintiffs, re-

4

alleges each and every allegation contained in the General Allegations and in the First and

5

Second Cause of Action of this Complaint as if set forth fully herein.

6

8.126 As indicated in the General Allegations in the First, Second, and Third Cause of

7

Action of Plaintiff's Complaint, the Defendant original mortgage lender, its Assignee whose

8

name is unknown to the Plaintiff, the loan servicer, negligently or intentionally and fraudulently

9

concealed material facts from the Plaintiffs/Borrower concerning the Plaintiff's mortgage loan

transaction which said Defendants had a duty to disclose to the Plaintiff mortgage loan borrower

10

and which, in equity and good conscience, should have been timely disclosed to the Plaintiffs by

11

said Defendants.

12

8.127 That on information and belief, the Defendants acting in its capacity as the Servicer

13

of the Plaintiff's home mortgage loan, has also concealed from the Plaintiffs material facts

14

described in the General Allegations and in the First and Second Cause of Action of Plaintiff's

15

Complaint. That Plaintiffs home mortgage loan borrower from whom the facts were concealed

was ignorant of the facts concealed.

16

17

8.128 That the Defendants above named intended that the facts concealed be acted upon

by the Plaintiff home mortgage loan borrower.

18

19

8.129 That the Plaintiffs, acted on the concealment, resulting in damages to the Plaintiff.

20

On information and belief, the Defendants named above have negligently and/or fraudulently

concealed from and have failed and refused to disclose to the Plaintiff/Borrower material facts

21

regarding that loan including but not limited to: the consideration, if any, paid by the assignee of

22

Plaintiff's home mortgage loan to JP MORGAN CHASE BANK, NA, the name of the person or

23

entity who currently has custody of the original of the Promissory Notes signed by the Plaintiff

24

mortgage loan borrower at the inception of the Plaintiff's residential mortgage loan when, on

25

information and belief, said Defendants knew, or in the exercise or reasonable care, should have

known that information;

CIVIL COMPLAINT for money damages
and rescission of mortgage contract          62

A. That said Defendants have failed to reveal to the Plaintiff the name and address of the person or entity in possession of the original of those Promissory Notes if the original of those Notes still exists; and -

B. That said Defendants have failed to advise the Plaintiff whether those Notes has been lost, stolen or destroyed, whether by shredding or otherwise, or to disclose to the Plaintiff/Borrower the current whereabouts of the original of those Promissory Notes or produce an individual with personal knowledge of the facts and circumstances surrounding the loss or destruction of those notes to testify under oath regarding those facts; and -

C. That said Defendants have failed to reveal to the Plaintiff/Borrower whether their loan has been securitized and, if so, any details regarding that securitization including the name or names of the investor or investor who purchased the loan, details regarding whether the purchaser of the Plaintiff's mortgage loan have ever purchased one or more Credit Default Swaps insuring their investment in that loan and, if so, the date one or more Credit Default Swaps were purchased, the premium or other consideration paid to the issuer of those Credit Default Swaps and whether the Defendant purchaser of the Plaintiff's home loan or anyone else has made a claim under those Credit Default Swaps and collected any money from the issuer of those Credit Default Swaps.

D. The Defendants above named have also negligently or intentionally concealed from and refused to disclose to the Plaintiffs mortgage loan borrower the true name and address of the assignee of the Deeds of Trust and the assignee by endorsement or transfer of the Promissory Notes signed by the Plaintiff mortgage loan borrower.

E. That despite a request therefore by the Plaintiffs/Borrower, the Defendants have negligently or intentionally concealed from and failed and refused to provide the Plaintiffs/Borrower with a copy of the Loan Servicing Agreement relating to the Plaintiff's home loan so that, among other things, the Plaintiff can review that Loan Servicing Agreement and attempt to determine from it, among other things, whether that Loan Servicing Agreement purports to authorize any of the above named Defendants to modify the Plaintiff's home loan or to sell or to commission some other person or entity to sell the Plaintiff's residence/property at the upcoming Trustee's Sale and to determine whether the Plaintiff's loan servicer has the power to delegate the task of conducting that Trustee's Sale to the Defendant's agents.

F. That, on information and belief, the Defendants including JP MORGAN CHASE BANK, NA, the assignee of the Plaintiff's home mortgage loan whose name is unknown to the Plaintiff, and DOE Defendants in the course of their businesses, professions or

employment, or in the above referenced real estate transaction in which they have a pecuniary interest, have supplied false information for the guidance of others including the Plaintiff in their business transactions and are subject to liability for pecuniary loss caused to the Plaintiffs/Borrower by the Plaintiff's justifiable reliance upon the information provided, concealed and withheld from this Plaintiff, since the Defendants and each of them failed to exercise reasonable care or competence in obtaining or in communicating that information.

G. That the Plaintiffs home loan borrowers was the foreseeable user of the above information.

H. That the Plaintiff/Borrower reasonably relied upon the accuracy of the information provided and reasonably believed that JP MORGAN CHASE BANK, NA, acting in its capacity as the Servicer of Plaintiff's loan was the authorized representative of the Plaintiff/Borrower's actual lender who he believed was WASHINGTON MUTUAL BANK to his detriment.

I. That any Trustee's Deed to be issued by the trustee following a non-judicial foreclosure sale of the subject property to a purchaser at that sale will be outside the recorded chain of title to the Plaintiff's property and will therefore not convey marketable title to any purchaser at that Trustee's Sale.

J. That despite the Plaintiff's good faith reliance upon the representations made to him by the Defendant, the Plaintiffs/Borrower are presently faced with the repercussions of the non-judicial foreclosure of our mortgage loan as our property is about to be sold at the Trustee's Sale to be conducted by an alleged "trustee" who was not authorized by the Plaintiff, by his lender of record, or by the assignee of the Plaintiff's original mortgage lender of record to conduct a Trustee's Sale of the Plaintiff's property and will soon be threatened with eviction from his residence through a Writ of Possession wrongfully awarded to the defendants at a subsequent eviction action brought by the purchaser at that Trustee's Sale.

The Notes cannot be transferred or sold when the note is a non-negotiable instrument. The adjustable rate rider, makes the notes a conditional promise to pay, rather than an unconditional promise to pay pursuant to Uniform Commercial Code 3-106 and the equivalent under California law, making it a non-negotiable instrument.

CIVIL COMPLAINT for money damages
and rescission of mortgage contract          64

The notes were transferred in violation of California Commercial Code § 3106, the California version of the UCC section cited above, and in violation of the subrogation doctrine, see *Aetna L. Ins. Co. v. Middleport*, 124 US 534 (1888). As a result of the foregoing, the note was transferred in violation of California law, and said transfer is null and void. Because the lender, JP MORGAN CHASE BANK, NA, steadfastly refused to produce the original notes therefore we know that the notes were sold to someone, in violation of the above-cite law. The adjustable rate rider attached to our note states as follows: "This Adjustable Rate Rider is made this July 17, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Initial Interest Adjustable Rate Note (the "Note") to Washington Mutual Bank( the "lender") of the same date and covering the property described in the Security Instrument located at 1156 Barcelona Drive, Pacifica, Ca 94044."

.      The track record for real justice in California State Courts during the course of an unlawful detainer lawsuit is very poor will undoubtedly not permit the Plaintiff mortgage loan borrower to challenge the Defendant original lender or its assignee, whoever that might be, with compliance with all of the requirements contained in California law including California Civil Code § 2924 et. seq.

K. That the Loan Servicer JP MORGAN CHASE BANK, NA, and CHASE HOME FINANCE, LLC has negligently or intentionally concealed from and misrepresented to the Plaintiff the nature and extent of the Trustees involvement in the Plaintiff's home loan; Has negligently concealed from and misrepresented to the Plaintiff the extent to which an assignee of the Plaintiff's lender can lawfully authorize the trustee to non-judicially foreclose on the Deed of Trust.

The Plaintiff is ready to conduct a Trustee's Sale of the subject property, without compliance with the "power of sale" clause found in California Civil Code § 2924, and will thereafter be able to thereafter pass marketable title to a purchaser at said Trustee's Sale.

L. That as a direct and proximate result of the Defendants' intentional or negligent concealment from the Plaintiff of material facts relating to his mortgage loan, the Plaintiff has been damaged in an amount to be proven at time of trial but, in any event, in an amount above the maximum arbitration limits of this court.

M. That the Defendants' concealment of material facts regarding Plaintiff's mortgage loan from him was done with an "evil mind" entitling the Plaintiff to an award of punitive damages in an amount to be proven at time of trial.

8.130 Plaintiff's became aware after careful study and analysis that the original deed of trust claims a security interest in the subject property based upon the transfer of Federal Reserve notes, which is commercial paper, as described in *Clearfield Trust Company v US*, 318 US 363; which states; "the United States as a drawee of commercial paper [federal reserve notes] stands in no different light than any other drawee" (bracketed portion added).

8.131 We realized that the Federal Reserve System never provides anything of substance or intrinsic value when they create the credit, which is only a bookkeeping entry for the loan, which is created by completing a ledger entry in the records of the bankers who wrote the original note and deed of trust, Please See **Exhibit** C for factual evidence that the banks do not incur a financial loss or damages when a loan is not repaid. The Defendants, in this matter have not incurred a financial cost or damages by our failure to pay the alleged balance due on the note in this matter. When the Defendant creates money it does not cost them anything to create said money.

8.132 We base our statement of fact upon **Exhibit** C, pages 9, 10, 11, 22, 23, and 24 of the House Banking and Currency Committee Report called "Money Facts" published in 1964, which states on page 23 the following; "The business of banks is to lend money. The profit comes from the difference between the cost of creating money and the price they charge borrowers for that money.

8.133 Now the cost of creating money is negligible. Congress has delegated the power to create money to the banking system without a charge. The banks do not pay a license fee or a payment charge for their reserves. Thus the raw materials the banks use cost them nothing." (Emphasis added). My statement is derived from the technical descriptions of banking practices found in Money Facts, published in 1964 by the House Banking Committee, which is hereby incorporated by reference in this civil action as **Exhibit** C.

8.134 The organic laws of this nation requires that "no state shall... make anything but gold and silver coin a tender in payment of debts", Constitution for the united states of America, Article I, § 10. The Federal Reserve Banking Scheme is based upon the deliberate and planned raising of interest rates by the Federal Reserve Bank of New York in October of 1929, and the

subsequent deliberate crash of the stock market in 1929, called black Monday.

8.135 The original lender offered to loan us Lawful money of the United States of America, claiming that they had money to loan. We accepted their offer not knowing, at the time, that they were going to loan us commercial bank credit. The Defendants predecessor-interest used this Federal Reserve Banking scheme to create money out of the promissory note and a series of bookkeeping entries, rather than loaning something of substance or value. As a result, the original mortgage is void, unenforceable and without force and effect, because of a lack of valuable consideration, and breach of contract.

8.136 The best sources of information on the origins and use of credit as money are in Alfred Marshall, MONEY, CREDIT & COMMERCE 249-251 (1929) and Charles P. Kindleberger, A FINANCIAL HISTORY OF WESTERN EUROPE 50-53 (1984). A synthesis of these sources, as applied to the facts of the present case, is as follows: As commercial banks and discount houses (private bankers) became established in parts of Europe (especially Great Britain) and North America, by the mid-nineteenth century they commonly made loans to borrowers by extending their own credit to the borrowers or, at the borrowers' direction, to third parties.

8.137 The typical form of such extensions of credit were drafts or bills of exchange drawn upon themselves (claims on the credit of the drawees) instead of disbursements of bullion, coin, or other forms of money. In transactions with third parties, these drafts and bills came to serve most of the ordinary functions of money. The third parties had to determine for themselves whether such "credit money" had value and, if so, how much.

8.138 The Federal Reserve Act of 1913 was drafted with this model of the commercial economy in mind and provided at least two mechanisms (the discount window and the openmarket trading desk) by which certain types of bankers' credits could be exchanged for Federal Reserve credits, which in turn could be withdrawn in lawful money. Credit at the Federal Reserve eventually became the principal form of monetary reserves of the commercial banking system, especially after the suspension of domestic transactions in gold in 1933. Thus, credit money is not alien to the current official monetary system.

CIVIL COMPLAINT for money damages
and rescission of mortgage contract          67

8.139 The bookkeeping entries required by application of GAAP and the Federal Reserve's own writings should trigger close scrutiny of the Defendant's apparent assertions that it lent its funds, credit, or money to or on behalf of the Plaintiff, thereby causing them to owe the Defendant money. According to the standard bookkeeping entries used by banks and application of GAAP, the Plaintiff allegedly was to tender some form of money, securities or other capital equivalent to money, funds, credit, or something else of value in exchange (money of exchange, loosely defined), collectively referred to herein as "money," to repay what the Defendant claims was the money lent to the Plaintiff.

8.140 Therefore, the bank's original bookkeeping entry should show an increase in the amount of the asset credited on the asset side of its books and a corresponding increase equal to the value of the asset on the liability side of its books. This would show that the bank received the customer's signed promise to repay as an asset, thus monetizing the customer's signature and creating on its books a liability in the form of a demand deposit or other demand liability of the bank, see **Exhibit** E, MODERN MONEY MECHANICS, page 6, right column, second paragraph, and page 7, WHICH DISPLAYS at diagram 3, the fact that the banks loans are an asset of the bank and are offset by the credits to the borrowers transaction account, which are a liability of the bank.

8.141 The amount of that liability is equal to the amount of the loan. As a result of the foregoing, the typical bank loan is a mutual loan between the lender and the borrower. The bank then usually would hold this demand deposit in a transaction account on behalf of the customer. Instead of the bank lending its money or other assets to the customer, as the customer reasonably might believe from the face of the Note, the bank created funds for the customer's transaction account without the customer's permission, authorization, or knowledge and delivered the credit on its own books representing those funds to the customer, meanwhile alleging that the bank lent the customer money.

8.142 If Defendant's response to this line of argument is to the effect that it acknowledges that it lent credit or issued credit instead of money, one might refer to Thomas P. Fitch, BARRON'S BUSINESS GUIDE DICTIONARY OF BANKING TERMS, "Credit banking," 3. "Bookkeeping entry representing a deposit of funds into an account." But

1   Defendant's loan agreement apparently avoids claiming that the bank actually lent the Plaintiff

2   money.

3       8.143 The mortgage note and deed of trust cannot form the basis of any kind of lien or

4   security against my private allodial property.

5       8.144 Wherefore, We, Lawrence Munar Asuncion and Maria Estrella C. Asuncion, the

6   Plaintiffs, pray for a judgment against the Defendants including punitive damages, the amounts

7   to be proven at the time of trial.

8                       FIFTH CAUSE OF ACTION.

9                       (Negligent Misrepresentation)

10      8.145 We, Lawrence Munar Asuncion and Maria Estrella C. Asuncion, the Plaintiffs,

11  allege and re-allege each and every allegation set forth in the General Allegations and in the

12  First, Second and Third Cause of Action of his Complaint as if set forth fully herein.

13      8.146 A covenant of good faith and fair dealing is implicit in the contracts between the

14  Plaintiffs loan borrower and our original lender WASHINGTON MUTUAL BANK its lawful

15  successors and assigns and in any purported contract between the Plaintiffs/Borrower and the

16  Servicer of the Plaintiff's home mortgage loan.

17      8.147 That 'but for' the Defendants misrepresentation, non-disclosure and their

18  concealment from the Plaintiffs/Borrower of material information regarding the broad scope of

    authority supposedly granted to the Trustee at the inception of the Plaintiff's home loan prior to

19  the execution of the Deed of Trust in question, the Plaintiff would never have executed the Deed

20  of Trust, signed the Promissory Notes, or agreed to appoint the Trustee to act on behalf of the

21  Defendant lender to act in any other capacity.

22      8.148 Defendants made material alterations to the, promissory notes by endorsing

23  "Without Recourse" on them after closing as noted in their prospectuses. Pursuant to § 3407 of

24  the California Commercial Code these unauthorized signatures/ alterations to the Promissory

25  Notes under California Commercial Code § 3403, endorsements, conveyances, conversions and

CIVIL COMPLAINT for money damages
and rescission of mortgage contract          69

sales without disclosure, or notice to or permission from the Petitioners is illegal and voids the transaction in its entirety. (b) Respondents made representations to the Petitioners that they were loaning money, when the Pooling and Servicing Agreements and the S-3 Registration Statements, Rule 424B5 Prospectuses, RC-S Call Schedules, evidences that they did not.

8.149 Defendants and each of them further misrepresented to and concealed from the Plaintiff mortgage loan borrower other material facts including but not limited to all of the following:

(a) that assignments of the Deed of Trust signed by the Plaintiff's original lender WASHINGTON MUTUAL BANK

(b) that assignments of the Promissory Notes signed by the Plaintiff home loan borrower,

(c) that reassignments of that Deed of Trust and Promissory Note,

(d) that transfers of the lender's interest in the Promissory Note signed by the Plaintiff/Borrower by endorsement or otherwise,

(d) that Satisfactions of Mortgage,

(e) that notices advising the Plaintiff/Borrower that his mortgage loan had been securitized and sold to one or more investors whose names would never be revealed to the Plaintiffs/Borrower until such time as an entity to whom his original mortgage loan had been assigned appointed a person or entity such as a trustee to conduct a non-judicial Trustee's Sale of my property,

(f) that notice or notices that the Plaintiff's new alleged lender by assignment or "investors" who may have purchased Credit Default Swaps which provided insurance guarantying that the issuer of the Credit Default Swap would pay the new lender the full amount of or the remaining amount due on the Plaintiff's mortgage loan in the event that the Loan Servicer determined that Plaintiff/Borrower was delinquent in making monthly mortgage payments on his loan and in the event that happened that the new lender could submit a claim to the insurer issuing those credit default swaps which claim once paid would satisfy the Plaintiff's mortgage loan in full requiring the insurer or the new lender/investor to record a Satisfaction of the Plaintiff's mortgage loan but that none of such documents would be recorded in the Office of the San Mateo County Recorder with all of the above documents and information made unavailable to the Plaintiff mortgage loan borrower.

Furthermore, the Defendant or their principal purchased credit default swaps or other types of Credit enhancements and have, therefore, been paid the alleged debt and have no standing to demand payment for a debt that has been already been paid.

8.150 **Defendants used** Fraudulent and Unlawful Financing and accounting techniques called Securitization or Off Balance Sheet Financing to change and alter the Debt to Equity ratio.

8.151 **Defendants did** this by transferring and conveying ownership of the loan documents to third party individuals, entities, companies and / or trusts, which are referred to in the S-3 Registration Statements, 424B5 Prospectuses as SPV [Special Purpose Vehicle], SPE [Special Purpose Entities], REMIC [Real Estate Mortgage Invest Conduits], FASIT [Financial Asset Securities Investment Trusts], BRE [Bankruptcy Remote Entities], REIT's [Real Estate Investment Trusts], thereby altering, increasing, and accelerating the interest and principal on the original loan documents the Deeds of Trusts, Security Instruments and Promissory Notes, which directly attributed to the default of the loan. In this type of financing technique the Assets and Liabilities or Receivables and Payables are never matched or balanced on the Respondents 2046 Balance Sheet.

8.152 This allows Defendants to disguise investment contracts as mortgage loans. This is exactly what JP MORGAN CHASE and Enron were doing in the "Enron Scandal", only in reverse as they were disguising mortgage loans as investment contracts [See Civil Action H-01-3624, ENRON v MARK NEWBY U.S. DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION].

8.153 As established previously the Promissory Notes once made subject to the Deeds of Trust, etc., became non-negotiable. Therefore the "Notes" were not Notes-in-fact, but rather Investment contracts.

"In contrast, the Eighth and District of Columbia Circuits apply the test we created in SEC v. W. J. Howey Co., 328 U.S. 293 (1946), to determine whether an instrument is an "investment contract" to the determination whether an instrument is a "note." Under this test, a note is a security only if it evidences "(1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; (4) to be derived from the entrepreneurial or managerial efforts of others." 856 F.2d, at 54 (case below).

Accord, *Baurer v. Planning Group, Inc.*, 215 U.S. App. D.C. 384, 391-393, 669 F.2d 770, 777-779 (1981). See also *Underhill v. Royal*, 769 F.2d 1426, 1431 (CA9 1985) (setting forth what it terms a "risk capital" approach that is virtually identical to the Howey test)."*Id.*.

8.154 An investment contract thus came to mean a contract or scheme for the 'placing of capital or laying out of money in a way intended to secure income or profit from its employment." *State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 56, 177 N.W. 937, 938. " this definition was uniformly adopted by state courts to a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of some one other themselves." SECURITIES and EXCHANGE COMMISSION v. W.J. HOWEY CO,. 328 U.S. 293 (1946).

8.155 The Uniform Residential Loan Application, The Deeds of Trust, Security Agreements and Promissory Notes contain all four elements of an investment contract. Plaintiff's did not knowingly or willingly sign an investment contract and neither did Defendants disclose that Plaintiff's were entering into an investment contract or agreement with the Defendants to make cash flow payments through a paying agent to the beneficial interest holders or investors (Purchasers of Mortgage Backed Securities) as outlined in the Pooling and Servicing Agreement(s), S-3 Registration Statements, 424B5 Prospectuses and RC-S Call Reports.

8.156 As a part of the common law duty of good faith and fair dealing, the Defendants and each of them had a duty to disclose but negligently failed to disclose to the Plaintiffs/Borrower, facts material to the present residential mortgage loan transaction in which the Plaintiff/Borrower was involved at all stages of that mortgage loan transaction.

8.157 That the Defendants all breached the covenant of good faith and fair dealing, breached the terms and conditions of their contract with the Plaintiff home loan borrower represented by the Deed of Trust signed by the Plaintiff home loan borrower, breached the terms and conditions of the Loan Servicing Agreement a copy of which has never been provided to the Plaintiff home loan borrower, and negligently or intentionally failed to disclose to and concealed from the Plaintiffs/Borrower material facts regarding our home loan which said Defendants had an obligation to disclose.

1    8.158 In addition to the allegations of fraud and misrepresentation set forth above, on

2  information and belief, the Defendants' acts of misrepresentation, negligent misrepresentation,

3  fraudulent concealment, tortuous non-disclosure and fraud included but were not limited to all of

4  the following:

5    (a) Defendants negligently or fraudulently concealed from the Plaintiff/Borrower the fact
     that the subject home loan had been securitized,

6    (b) Defendants failed to notify the Plaintiffs/Borrower of the material consequences the

7    securitization of the Plaintiff's home loan would have on the Plaintiffs/Borrower, among

8    other things, in the event, at a later date, he attempted to seek a modification of the terms
     and conditions of his home loan which loan modification request, once submitted, could

9    not be granted by the loan servicer without the express written consent of the assignee of
     the Plaintiff's home loan via securitization whose name has never been revealed to the

10   Plaintiffs/Borrower,

11   (c) when the above named Defendants negligently or intentionally failed to provide the

12   Plaintiff homeowner/ borrower with an explanation in terms he could be reasonably be

13   expected to understand as a lay-person of the convolute relationships between the various
     trustees, beneficiaries, trustors, loan servicers, nominees, investors, lenders, assignees of

14   lenders, assignees of beneficial interests in the Plaintiff's mortgage loan, loan originators,
     mortgage brokers, and others, involved in the arcane and abstruse process of the

15   securitizing the Plaintiff's home mortgage loan,

16   (d) when the Defendants negligently or intentionally failed and refused to provide the

17   Plaintiffs/Borrower with an explanation in terms a lay person could reasonably be
     expected to understand of the multiple material impacts that securitization of the subject

18   home loan would have upon the rights and obligations of the parties under the Deed of

19   Trust signed by Plaintiff/Borrower,

20   (e) when the Defendants negligently or intentionally failed to disclose to and concealed
     from the Plaintiffs information regarding

21   (1) the name and address of the "holder" or the successor holder of the

22   Promissory Note signed by the Plaintiffs/Borrower at the time the Plaintiffs allegedly

23   became delinquent in the payment of amounts due under that Note, and at the time
     when the loan servicer purported to appoint the Trustee to enforce the instrument

24   pursuant to UCC and Uniform Commercial Code § 3-309(A),

25

(2) the name and address of a non-holder in possession of the Promissory Note with purported authority to enforce the instrument under UCC and California Commercial Code § 3-309(A),

(3) the name and address of a person not in possession of the instrument with purported authority to enforce the instrument under UCC and Uniform Commercial Code § 3-309(A),

(f) when the Defendants named above negligently or intentionally failed and refused to provide the Plaintiffs/Borrower with a copy of the Loan Servicing Agreement and the Master Loan Servicing Agreement between the Defendant loan servicer and the Plaintiff's original lender or between the loan servicer and the assignee of record of the Plaintiff's original lender,

(g) when the Defendants negligently or intentionally failed and refused to disclose to the Plaintiffs/Borrower that the Mortgages we signed naming the Plaintiffs as "borrower" and naming WASHINGTON MUTUAL BANK as our original lender had been assigned to a third party whose name and address the Defendants had a duty to disclose to the Plaintiffs/Borrower but negligently or intentionally failed and refused to disclose to the Plaintiffs/Borrower along with the date of that purported assignment of the lender's interest in those mortgages,

(h) when the Defendants negligently or intentionally failed and refused to notify the Plaintiffs/Borrower that the assignment of the Mortgages signed by the Plaintiffs/Borrower to a new lender whose name was never disclosed to the Plaintiffs/Borrower would NOT be disclosed to the Plaintiffs/borrower

(i) when the Defendants negligently or intentionally failed and refused to disclose to the Plaintiffs/Borrower the existence of or any information about or concerning the Pooling & Servicing Agreement dictating the rights and obligations of the parties to that Pooling and Servicing Agreement including, among other things, the types of loans in the pool of which the Plaintiff's home mortgage loan forms a part, and the relationships among and between the various parties involved in the pool;

(j) when the Defendants negligently or intentionally failed to disclose to the Plaintiff loan borrower how the Pooling and Servicing Agreement to which the Plaintiff's loan servicer was a party might affect the servicing of Plaintiff's home mortgage loan and the Plaintiff's right to apply for and obtain a modification of the subject home loan,

(k) when the Defendants negligently or intentionally failed and refused to disclose to the Plaintiff details concerning the relationship among and between the Plaintiffs/Borrower,

our original lender, the purported assignee of the Plaintiff's mortgage loan whose name has never been disclosed to the Plaintiffs, and the Loan Servicer,

(l) when Defendants negligently or intentionally failed and refused to disclose to the Plaintiffs the name and address of the investor or investors who purchased a bond or certificate in which the Plaintiff's mortgage loan is apparently included, and details regarding how the existence of that Pooling & Servicing Agreement might affect the Plaintiff's ability to negotiate with a person or entity authorized to grant a modification of the Plaintiff's home loan, in the event that the Plaintiffs sought such a modification.

8.159 On information and belief, the Defendants also engaged in the following additional acts of negligent misrepresentation and fraudulent concealment when they negligently or intentionally failed to disclose to the Plaintiffs/Borrower:

(a) material facts regarding the relationship among and between the Plaintiff's original mortgage lender and the purported assignee of his home loan whose name has never been disclosed to the Plaintiff including, among other things, what consideration, compensation or payment, if any, WASHINGTON MUTUAL BANK received from the transferee/assignee of the Plaintiff's home loan in consideration for the transfer or the assignment of WASHINGTON BANK's interest in the Mortgages signed by the Plaintiff/Borrower,

(b) the name and address of the loan servicer, if any, during the time period when the Plaintiffs/Borrower was still making monthly mortgage payments to WASHINGTON MUTUAL BANK prior to any assignment of the Mortgages and Promissory Notes we signed to a third-party,

(c) details regarding the authority, if any, the loan servicer had to modify Plaintiff's home loan without the prior express written consent of the assignee of Plaintiff's home loan,

(d) the name and address of the current "custodian" of the original of the Promissory Note signed by the Plaintiffs/Borrower with the alleged right to enforce the instrument at the time the Trustee's Sale takes place,

(e) the name and address of the "holder" of the Promissory Notes identified in the Mortgage with the right to enforce the instrument on the date the Trustee's Sale will take place, (6) the name and address of the person or persons who have endorsed or negotiated the Promissory Notes along with the date the Promissory Note was endorsed or negotiated and entered into the stream of commerce,

(f) whether that Promissory Note has ever been allegedly lost, stolen, misplaced, destroyed, or shredded and, if so whether a substitute note has ever been created which the Defendants or any of them now seek to enforce, and

(g) whether the Promissory Note has been paid in whole or in part or otherwise satisfied, and, if so, the date when that Note was paid or satisfied and the name of the person or entity who paid or satisfied the Note, along with the date any Satisfaction or Release of the Promissory Note or the Deed of Trust on the property was recorded.

8.160 That pursuant to UCC and Uniform Commercial Code § 3-301, UCC and Uniform Commercial Code § 3-304 and UCC and Uniform Commercial Code § 3-309, unless Defendant seeking to enforce the Note is the holder of the instrument, or if a non-holder in possession of the instrument has the rights of a holder, or if a person not in possession of the instrument who is a person entitled to enforce the instrument, none of said Defendants were entitled to enforce the instrument or to conduct or to authorize the trustee to conduct the Trustee's Sale of the Plaintiff's property.

8.161 That, the Plaintiffs/Borrower has never knowingly authorized his original mortgage lender or its assignee to securitize the note.

That the Mortgage backed Security is not a signatory on the Deed of Trust or note and had no right, title or interest in the subject property and therefore had no right or entitlement to commission any person or entity, including the trustee, to conduct a non-judicial foreclosure sale/Trustee's Sale of the Plaintiff's property.

8.162 That to the extent that the Trustee for the Mortgage Backed Security claims to be acting solely as a nominee for the Defendant Lender or for that Lender's successors and assigns or as the beneficiary under the Deed of Trust signed by the Plaintiffs/Borrower, any such claims are unenforceable, void and of no force and effect since any contract pursuant to which the Mortgage Backed Security purports to be acting in any of those capacities violates public policy, lacks mutuality of obligation, is both procedurally and substantively unconscionable and constitutes an unenforceable contract of adhesion for all of the reasons set forth above.

8.163 That Plaintiff has been damaged in an amount to be proven at time of trial by reason of the fact that the Plaintiff's original lender, its assignee whose name is unknown to the Plaintiff, the Loan Servicer, and the Defendants are about to conduct a Trustee's Sale of the Plaintiff's property without authority to do so, without a showing that any of the above named Defendants were in fact the holder of the Promissory Note with the right to enforce the Note, without a showing that any of the Defendants although not the holder in possession of the instrument had the rights of a holder and without a showing that a person not in possession of the instrument was entitled to enforce the instrument, and without first producing the original of the Promissory Note signed by Plaintiff/Borrower or otherwise explaining its absence with admissible evidence.

8.164 As a result, the Defendants engaged in fraudulent concealment and misrepresentation, by concealing the identity of the new beneficiary in violation of the above-cited law.

8.165 That the Plaintiffs/Borrower has also been damaged in an amount to be proven at trial as a result of the above named Defendants' negligent or intentional failure to disclose to the Plaintiffs/Borrower the fact that the Loan Servicer has no authority from the Lender or from the assignee of that Lender to consent to any modification of the Plaintiff's home loan despite the fact that the Plaintiffs home loan borrower negotiated unsuccessfully with the Loan Servicer in an effort to obtain a modification of the subject home loan.

8.166 That the failure of the above named Defendants to produce the original of that Promissory Note raises the possibility that another person, entity or financial institution may have already purchased that Note giving that purchaser a continuing right to collect on the same debt despite the sale of the subject property at a non-judicial Trustee's Sale thereby clouding title to the Plaintiff's property and potentially exposing the Plaintiff home loan borrower to additional financial risk.

8.167 That the above named Defendants' failure to produce the original of that Promissory Note also raises the specter that if that Note has been lost, is missing, has been stolen, or has been destroyed or shredded, the Defendants cannot lawfully enforce the security

provided by that Note and are not the Real Parties in Interest under Rule 17, Ca.R.Civ.Proc. with power to enforce the Note or the Deed of Trust securing payment of said Note. Furthermore, the Defendants are poised to hold a foreclosure auction in violation of the Seventh Amendment to the US Constitution and the Due Process Clause of the Fifth Amendment, and California Civil Code § 2924, requiring that the sale or transfer must be preceded by a court order from a court of record, thereby misrepresenting themselves as lawfully exercising the power of sale.

8.168 That since the name of the assignee of the Defendant original lender's interest in that home loan has not been disclosed to the Plaintiffs/Borrower, that unnamed assignee, the Defendant Loan Servicer, and the trustee have no authority to enforce the security at any non-judicial Trustee's Sale of the Deed of Trust signed by the Plaintiffs/Borrower.

8.169 That the Plaintiff has been damaged by the numerous acts of negligent or intentional misrepresentation, concealment of material facts from the Plaintiff regarding our home loan which the Defendants had a duty to disclose and reveal to the Plaintiffs/Borrower entitling us to an award of consequential damages in an amount to be proven at time of trial, but in any event, in an amount above the maximum arbitration limits of the court.

8.170 That, on information and belief, the Defendants' acts of negligent misrepresentation, fraudulent concealment and fraud was done with an "evil mind" entitling the Plaintiff to an award of punitive damages in an amount to be proven at time of trial.

///

///

///

///

///

CIVIL COMPLAINT for money damages
and rescission of mortgage contract          78

1

## IX. RELIEF REQUESTED.

2      9.1 WHEREFORE Plaintiff prays for Judgment in his favor and against the Defendants

3   and each of them as follows:

4      9.2 Declare that Defendants' security interest in the subject property is void.

5      9.3 Declare that the purported power of sale contained in the Deed of Trust has been

6   rendered void and ineffective against the subject property.

7      9.4 Declare that the title to the subject property is quieted in Plaintiffs.

8      9.5 Declare that title to the subject property shall remain with the Plaintiff.

9

10      9.6 Enjoin Defendants and each of them from attempting to foreclose, or from

11   foreclosing upon the subject property.

12      9.7 Declare that mortgages securing the subject property are cancelled and void, and that

13   any security interests and Promissory Note are void.

14      9.8 Judgment rescinding the subject Promissory Note and setting forth terms of

15   restitution.

16      9.9 Declare that Lawrence Munar Asuncion and Maria Estrella C. Asuncion are the

17   prevailing parties in this action.

18      9.10 Award of general and special damages, and for punitive damages.

19      9.11 Award of such other relief the Court may deem just and due.

20      9.12 For a trial by jury; and

21

22      9.13 Plaintiff requests leave to amend this Complaint if the Court deems it to be deficient.

23   ///

24   ///

25

CIVIL COMPLAINT for money damages
and rescission of mortgage contract          79

# X. VERIFICATION.

10.1 I, Lawrence Munar Asuncion and Maria Estrella C. Asuncion, do hereby declare under penalties of perjury that the exhibits attached hereto are accurately represented herein, and that the foregoing statements and claims are true and correct to the best of my knowledge, gained from examination of the record in this case, of court rules, and of applicable statutes.

10.2 Executed this _27th_ day of the month of September, 2010.

_____                    _____
Lawrence Munar Asuncion, Affiant                    Maria Estrella C. Asuncion, Affiant

10.3 The above affirmation was subscribed and duly sworn to before me, this _____ day of September, 2010 by Lawrence M. Asuncion and Maria Estrella C. Asuncion.

10.4 I, _____, am a Notary under license from the State of California whose Commission expires _____, and be it known by my hand and my Seal as follows:

_____ _Pls. see attached Jurat_____

Notary signature                              SEAL

Presented by:

_____    _____
Dated: _9/27/10_                    Lawrence Munar Asuncion    Maria Estrella C. Asuncion

1156 Barcelona Drive               1156 Barcelona Drive

Pacifica, California 94044         Pacifica, CA 94044

CIVIL COMPLAINT for money damages
and rescission of mortgage contract          80

# Jurat

State of California

County of San Mateo

Subscribed and sworn to (or affirmed) before me on this ____27th____ day of ____September_____,

20_10____ by ____Lawrence Munar Asuncion & Maria Estrella C. Asuncion_____,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.



_____
Signature

R. R. HENRY-PERRIN
Commission # 1711327
Notary Public - California
San Mateo County
My Comm. Expires Dec 16, 2010

(Notary seal)

---

# OPTIONAL INFORMATION

| DESCRIPTION OF THE ATTACHED DOCUMENT |
| --- |
| Federal Court Real Estate Lawsuit |
| (Title or description of attached document) |
| |
| (Title or description of attached document continued) |
| Number of Pages __80__ Document Date _09/27/10_ |
| |
| (Additional information) |

### INSTRUCTIONS FOR COMPLETING THIS FORM

*The wording of all Jurats completed in California after January 1, 2008 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one which does contain proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.*

- State and County inform ation must be the State and Cou nty wher e the document signer(s) personally appeared before the notary public.
- Date of notar ization must be the d ate that the si gner(s) per sonally appear ed which must also be the same date the jurat process is completed.
- Print the na me(s) of document signer(s) w ho personally appear at the tim e of notarization.
- Signature of the n otary public must match the signature on file  with the office of the county clerk.
- The notary seal im pression must b e clear and photogr aphically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.
  - ❖ Additional inform ation is not r equired but could help to ensur e this jurat is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document

# EXHIBIT A
## (Deed to the subject property)

Ex. A

Recording Requested By:
**WASHINGTON MUTUAL BANK  FA**

Return To:
**WASHINGTON MUTUAL BANK  FA**
**2210 ENTERPRISE DR**
**FLORENCE, SC 29501**
**DOC OPS M/S FSCE 440**

Prepared By:
**ZAREEN SIDDIQ**

---

**ZCA1**
**M35**

[Space Above This Line For Recording Data]

# DEED  OF  TRUST

**3062191972-068**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  **JULY 17, 2006**  ,
together with all Riders to this document.
**(B) "Borrower"** is  **LAWRENCE M ASUNCION AND, MARIA E ASUNCION, HUSBAND AND WIFE**

Borrower's address is  **1156 BARCELONA DRIVE, PACIFICA, CA 94044**
                            . Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is  **WASHINGTON MUTUAL BANK, FA**

Lender is a  **FEDERAL SAVINGS BANK**
organized and existing under the laws of  **THE UNITED STATES OF AMERICA**

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**       **Form 3005 1/01**

VMP®–6(CA) (0207)
Page 1 of 15                      Initials:_____
VMP MORTGAGE FORMS – (800)521-7291



Ex. A

Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV 89014
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is  CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORP

(E) "Note" means the promissory note signed by Borrower and dated JULY 17, 2006
The Note states that Borrower owes Lender NINE HUNDRED THOUSAND AND 00/100
Dollars
(U.S. $  900,000.00  ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than AUGUST 01, 2046
(F) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower (check box as applicable):

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

Initials: _____

VMP®-6(CA) (0207)                Page 2 of 15                Form 3005 1/01

Ex. A.

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the  COUNTY                           of  SAN MATEO                                     :

   [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT AND IS MADE A PART HEREOF.

Parcel ID Number:                                        which currently has the address of
**1156 BARCELONA DRIVE**                                                      [Street]
**PACIFICA**                                       [City], California **94044**    [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

Initials: _____

-6(CA) (0207)                          Page 3 of 15                          Form 3005  1/01


Ex. A.

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials: _____

VMP® –6(CA) (0207)          Page 5 of 15          Form 3005 1/01



Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

Ex. A.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

Initials: _____



EX . A

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.



Ex. A.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Initials: _____

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

 —6(CA) (0207)

Page 9 of 15

Initials: _____

Form 3005 1/01

EX. A.

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to



EX. A.

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

Initials: _____

-6(CA) (0207)          Page 12 of 15          Form 3005 1/01

Ex. A.

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

Initials: _____

—6(CA) (0207)                    Page 11 of 15                                    **Form 3005  1/01**

EX. A.

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.



—6(CA) (0207)        Page 13 of 15        Initials: _____        Form 3005 1/01

EX. A.

ZCA2

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

    **25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                                                        -Borrower
                                         LAWRENCE M ASUNCION


_____        _____ (Seal)
                                                                        -Borrower
                                         MARIA E ASUNCION


_____ (Seal)  _____ (Seal)
                      -Borrower                               -Borrower


_____ (Seal)  _____ (Seal)
                      -Borrower                               -Borrower


_____ (Seal)  _____ (Seal)
                      -Borrower                               -Borrower



EX. A.

State of California
County of  SAN MATEO                          } ss.

On                              before me,

                                              personally appeared

LAWRENCE M ASUNCION, MARIA E ASUNCION

personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.
WITNESS my hand and official seal.

_____ (Seal)

Initials: _____

-6(CA) (0207)                    Page 15 of 15              Form 3005 1/01



ORDER NO. : 0360006020-LH

# EXHIBIT A

The land referred to is situated in the County of San Mateo, City of Pacifica, State of California, and is described as follows:

Portion of Lot 5, as delineated upon that certain Map entitled, "Resubdivision of Linda Mar Estates, Resubdivides Lots 16, 17, 18, 19, 21, 22 and 23, Pacifica, San Mateo County, California", filed for Record in the Office of the Recorder of the County of San Mateo, State of California, on February 4th, 1965 in Book 61 of Maps, at Page 36, more particularly described as follows:

Beginning at the point of intersection of the Easterly line of said Lot 5, with the Southeasterly line of Barcelona Drive; thence from said point of beginning along said Easterly line South 14° 47" 21" West, 91.05 feet; thence leaving said Easterly line of Lot 5, South 7° 55" 09" West, 46.49 feet; thence South 29° 08" 28" West, 117.11 feet to the most Southerly corner of said Lot 5; thence along the line common to said Lot 5 and Lot 6, as shown on the above mentioned Map, North 48° 34" 39" West, 10.71 feet and North 80° 06" 58" West, 30.03 feet to the Westerly line of said Lot 5; thence along the general Westerly line of said Lot 5, North 9° 53" 02" East, 66.25 feet and North 29° 45" 32" West, 66.35 feet to the Southeasterly line of Barcelona Drive; thence along the last mentioned line, Northeasterly on the arc of a curve to the left, from tangent which bears North 60° 14" 28" East; said curve having a radius 170.00 feet, a central angle of 5° 14" 28", an arc distance of 15.55 feet and North 55° 00" East, tangent to the preceding curve, 162.02 feet to the point of beginning.

APN:  023-501-390                    JPN:  023-050-501-39

Ex. A.

LGLD

LEGAL DESCRIPTION

3062191972-068

THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE
EXHIBIT AND IS MADE A PART HEREOF.

EX.A.

# EXHIBIT B

## Copies of notices from Defendants to Plaintiffs

(Notice of Default & Election to Sell Under Deed of Trust; Notice of Trustee's Sale)

Ex. B

California Reconveyance Company
PO Box 9029
Temecula, CA 92589-9029



2235950168

PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

*Send Correspondence to:*
California Reconveyance Company
9200 Oakdale Avenue
Mail Stop N110612
Chatsworth, CA 91311

LAWRENCE ASUNCION
1156 BARCELONA DR
PACIFICA, CA 94044-3509

20100615-59
100CA



*Ex. B.*

1177-v7

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue                                    06/08/2010
Mail Stop: CA2-4379                                    DOC #2010-062162
Chatsworth, CA 91311
800 892-6902
(818)775-2258 (Fax)

_____
                                                      Space above this line for recorder's use only

Trustee Sale No. 443871CA   Loan No. 3062191972   Title Order No. 477367

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $30,713.03 as of June 01, 2010 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of property by paying the entire amount demanded by your creditor.



EX. B

Trustee Sale No. 443871CA   Loan No. 3062191972   Title Order No. 477367

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: JPMorgan Chase Bank, National Association, at 7301 BAYMEADOWS WAY , JACKSONVILLE, FL 32256, 800-848-9380.

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

**REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.** NOTICE IS HEREBY GIVEN THAT: CALIFORNIA RECONVEYANCE COMPANY is the duly appointed Trustee under a Deed of Trust dated 07-17-2006, executed by LAWRENCE M ASUNCION AND, MARIA E ASUNCION, HUSBAND AND WIFE, as trustor, to secure obligations in favor of WASHINGTON MUTUAL BANK, FA, as Beneficiary Recorded 07-25-2006, Book , Page , Instrument 2006-110150 of official records in the Office of the Recorder of SAN MATEO County, California, as more fully described on said Deed of Trust. APN: 023-501-390 Situs: 1156 BARCELONA DRIVE, , PACIFICA, CA 94044 Including the note(s) for the sum of $900,000.00 that the beneficial interest under said Deed of Trust and the obligations secured thereby are presently held by the beneficiary; that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the payment has not been made of: THE 01/01/2010 INSTALLMENT OF PRINCIPAL AND INTEREST AND ALL SUBSEQUENT MONTHLY INSTALLMENTS OF PRINCIPAL AND INTEREST; PLUS ANY ADDITIONAL ACCRUED AND UNPAID AMOUNTS INCLUDING, BUT NOT LIMITED TO, LATE CHARGES, ADVANCES, IMPOUNDS, TAXES, HAZARD INSURANCE, ADMINISTRATIVE FEES, INSUFFICIENT AND PARTIAL RETURN CHECK FEES, STATEMENT FEES, AND OBLIGATIONS SECURED BY PRIOR ENCUMBRANCES.

That by reason thereof, the present beneficiary under such Deed of Trust, has executed and delivered to said Trustee, a written Declaration and Demand for Sale, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing the obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

**SEE ATTACHED DECLARATION**

DATE: June 01, 2010

CALIFORNIA RECONVEYANCE COMPANY, as Trustee

DE ANDRE LEWIS,
Assistant Secretary

CALIFORNIA RECONVEYANCE COMPANY IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Ex. B.

**Borrowers:**       **LAWRENCE M ASUNCION**
                     **MARIA E ASUNCION**

**Property Address:**   **1156 BARCELONA DR., PACIFICA CA 94044**

**Loan Number:**        **3062191972**

# DECLARATION OF COMPLIANCE

### (California Civil Code Section 2923.5(b))

The undersigned mortgagee, beneficiary or authorized agent hereby declares under penalty of perjury, under the laws of the State of California, as follows:

☒  The mortgagee, beneficiary or authorized agent has contacted the borrower to discuss the borrower s financial situation and to explore options for the borrower to avoid foreclosure in compliance with Cal. Civ. Code Section 2923.5. Thirty days or more have elapsed since the borrower was contacted.

☐  The mortgagee, beneficiary or authorized agent tried with due diligence but was unable to contact the borrower to discuss the borrower s financial situation and to explore options for the borrower to avoid foreclosure as required by Cal. Civ. Code Section 2923.5. Thirty days or more have elapsed since these due diligence efforts were completed.

☐  The mortgagee, beneficiary or authorized agent was not required to comply with Cal. Civ. Code Section 2923.5 because:

     ☐  The real property is not an owner-occupied single family residence.

     ☐  The loan was not originated between January 1, 2003 and December 31, 2007.

     ☐  The borrower has surrendered the property as evidenced by either a letter confirming the surrender or delivery of the keys to the property to the mortgagee, trustee, beneficiary or authorized agent.

     ☐  The borrower has contracted with someone whose primary business is advising people who have decided to leave their homes on how to extend the foreclosure process and avoid their loan obligations.

     ☐  The borrower has filed for bankruptcy, and the proceedings have not yet been finalized.

I certify under penalty of perjury under the laws of the State of California that the above is true and correct.

JP Morgan Chase Bank, National Association

Date:   05/28/10
City/State: Jacksonville, Florida

Clement J. Durkin

Ex. B.

California Reconveyance Company
PO Box 9029
Temecula, CA 92589-9029



PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

7113 8257 1474 5744 3012

*Send Correspondence to:*
California Reconveyance Company
9200 Oakdale Avenue
Mail Stop N110612
Chatsworth, CA 91311

20100909-59

LAWRENCE ASUNCION
1156 BARCELONA DR
PACIFICA, CA 94044-3509



California Reconveyance Company
PO Box 9029
Temecula, CA 92589-9029



PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

7113 8257 1474 5744 3036

*Send Correspondence to:*
California Reconveyance Company
9200 Oakdale Avenue
Mail Stop N110612
Chatsworth, CA 91311

20100909-59

MARIA ASUNCION
1156 BARCELONA DR
PACIFICA, CA 94044-3509

Ex. B.

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue – CA2-4379
Chatsworth, CA 91311
800-892-6902

| **Trustee Sale No.** | **443871CA** |
| --- | --- |
| Loan No. | 3062191972 |
| Title Order No. | 477367 |

---

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 07-17-2006. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On 10-06-2010 at 01:00 PM, CALIFORNIA RECONVEYANCE COMPANY as the duly appointed Trustee under and pursuant to Deed of Trust Recorded 07-25-2006, Book , Page , Instrument 2006-110150 of official records in the Office of the Recorder of SAN MATEO County, California, executed by: LAWRENCE M ASUNCION AND, MARIA E ASUNCION, HUSBAND AND WIFE, as Trustor, WASHINGTON MUTUAL BANK, FA, as Beneficiary, will sell at public auction sale to the highest bidder for cash, cashier's check drawn by a state or national bank, a cashier's check drawn by a state or federal credit union, or a cashier's check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state. Sale will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to the Deed of Trust. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, interest thereon, estimated fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Place of Sale: THE MARSHALL STREET ENTRANCE TO THE HALL OF JUSTICE AND RECORDS, 400 COUNTY CENTER , REDWOOD CITY, CA

Legal Description: PORTION OF LOT 5, AS DELINEATED UPON THAT CERTAIN MAP ENTITLED, "RESUBDIVISION OF LINDA MAR ESTATES, RESUBDIVIDES LOTS 16,17, 18, 19, 21, 22 AND 23, PACIFICA, SAN MATEO COUNTY, CALIFORNIA", FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA, ON FEBRUARY 4TH, 1965 IN BOOK 61 OF MAPS, AT PAGE 36, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION OF THE EASTERLY LINE OF SAID LOT 5, WITH THE SOUTHEASTERLY LINE OF BARCELONA DRIVE; THENCE FROM SAID POINT OF BEGINNING ALONG SAID EASTERLY LINE SOUTH 14° 47' 21" WEST, 91.05 FEET; THENCE LEAVING SAID EASTERLY LINE OF LOT 5, SOUTH 7° 55' 09" WEST, 46.49 FEET; THENCE SOUTH 29° 08' 28" WEST, 117.11 FEET TO THE MOST SOUTHERLY CORNER OF SAID LOT 5; THENCE ALONG THE LINE COMMON TO

SAID LOT 5 AND LOT 6, AS SHOWN ON THE ABOVE MENTIONED MAP, NORTH 48° 34' 39" WEST, 10.71 FEET AND NORTH 80° 06' 58" WEST, 30.03 FEET TO THE WESTERLY LINE OF SAID LOT 5; THENCE ALONG THE GENERAL WESTERLY LINE OF SAID LOT 5, NORTH 9° 53' 02" EAST, 66.25 FEET AND NORTH 29° 45' 32" WEST, 66.35 FEET TO THE SOUTHEASTERLY LINE OF BARCELONA DRIVE; THENCE ALONG THE LAST MENTIONED LINE, NORTHEASTERLY ON THE ARC OF A CURVE TO

THE LEFT, FROM TANGENT WHICH BEARS NORTH 60° 14' 28" EAST; SAID CURVE HAVING A RADIUS 170.00 FEET, A CENTRAL ANGLE OF 5° 14' 28", AN ARC DISTANCE OF



Ex. B.

15.55 FEET AND   NORTH 55° 00" EAST, TANGENT TO THE PRECEDING CURVE, 162.02 FEET TO THE POINT OF BEGINNING.

Amount of unpaid balance and other charges: $987,315.04 (estimated)

Street address and other common designation of the real property:   1156 BARCELONA DRIVE
PACIFICA, CA 94044
APN Number:   023-501-390

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. The property heretofore described is being sold "as is".

In compliance with California Civil Code 2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their financial situation and to explore options to avoid foreclosure by one of the following methods: by telephone;  by United States mail; either 1st class or certified; by overnight delivery; by personal delivery; by e-mail; by face to face meeting.

**SEE ATTACHED EXHIBIT**

DATE: 09-09-2010
CALIFORNIA RECONVEYANCE COMPANY, as Trustee
714) 730-2727 or www.fidelityasap.com
(714) 573-1965 or www.priorityposting.com

*Deborah Brignac*
DEBORAH BRIGNAC, VICE PRESIDENT
9200 OAKDALE AVENUE, CHATSWORTH, CA 91311

CALIFORNIA RECONVEYANCE COMPANYIS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATIONOBTAINED WILL BE USED FOR THAT PURPOSE.

Ex. B.

Exhibit

### DECLARATION PURSUANT TO CALIFORNIA CIVIL CODE SECTION 2923.54

Pursuant to California Civil Code Section 2923.54, the undersigned loan servicer declares as follows:

1.   It has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.54 that is current and valid on the date the notice of sale is filed; and

2.   The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or Section 2923.55.

JPMorgan Chase Bank,
National Association

Name:  Ann Thorn
Title:    First Vice President

Ex. B.

# EXHIBIT C

Certified copy of "Money Facts" 1964
(Published by The Committee on Banking and Currency, House of Representative)
Selected Pages 8, 9, 10, 11, 22, 23, 24 & 25

*Ex. C.*

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, ~~er~~ the seal of the National Archives of the United States, that the attached reproduction(s) is a true and ~~co~~ copy of documents in his custody.

| SIGNATURE | | |
|---|---|---|
| NAME Richard H. Hunt | | DATE 10/03/07 |
| TITLE Director | | |
| Center for Legislative Archives | | |
| NAME AND ADDRESS OF DEPOSITORY | | |
| The National Archives Washington, D.C. 20408 | | |

NA FORM APR 85 1407-A

SEPTEMBER 21, 1964

Printed for use of the Committee on Banking and Currency

U.S. GOVERNMENT PRINTING OFFICE

37-240          WASHINGTON : 1964

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C., 20402 - Price 15 cents

EX. C.

Y4.B22/1:M74/16

Supp.

4512

[SUBCOMMITTEE PRINT]

# MONEY FACTS

## 169 Questions and Answers on Money—A Supplement to A Primer on Money

### *With Index*

---

## SUBCOMMITTEE ON DOMESTIC FINANCE

### COMMITTEE ON BANKING AND CURRENCY

### HOUSE OF REPRESENTATIVES

88th Congress, 2d Session



**SEPTEMBER 21, 1964**

---

Printed for use of the Committee on Banking and Currency

**U.S. GOVERNMENT PRINTING OFFICE**

**WASHINGTON : 1964**

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C., 20402 - Price 15 cents

37-340



EX. C

## LETTER OF TRANSMITTAL

SEPTEMBER 21, 1964.

*To Members of the Subcommittee on Domestic Finance:*

Transmitted herewith for the use of the Subcommittee on Domestic Finance of the Banking and Currency Committee, and other members of the committee and the Congress, as well as the general public, is a series of questions and answers on the basic workings of our monetary system. It is a supplement to "A Primer on Money" and is designed to highlight in question and answer form the basic points brought out in the "Primer." It has also been indexed so as to facilitate its use.

It is hoped that "Money Facts" will prove useful to students and all others interested in further study of and improvement in our monetary system and that it will stimulate serious thought, research and discussion of the critical issues involved.

WRIGHT PATMAN, *Chairman.*

III

COMMITTEE ON BANKING AND CURRENCY

WRIGHT PATMAN, Texas, Chairman

ALBERT RAINS, Alabama
ABRAHAM J. MULTER, New York
WILLIAM A. BARRETT, Pennsylvania
LEONOR K. SULLIVAN, Missouri
HENRY S. REUSS, Wisconsin
THOMAS L. ASHLEY, Ohio
CHARLES A. VANIK, Ohio
WILLIAM S. MOORHEAD, Pennsylvania
ROBERT G. STEPHENS, Jr., Georgia
FERNAND J. ST GERMAIN, Rhode Island
HENRY B. GONZALEZ, Texas
CLAUDE PEPPER, Florida
JOSEPH G. MINISH, New Jersey
CHARLES L. WELTNER, Georgia
RICHARD T. HANNA, California
BERNARD F. GRABOWSKI, Connecticut
CHARLES H. WILSON, California
COMPTON I. WHITE, Jr., Idaho

CLARENCE E. KILBURN, New York
WILLIAM B. WIDNALL, New Jersey
EUGENE SILER, Kentucky
PAUL A. FINO, New York
FLORENCE P. DWYER, New Jersey
SEYMOUR HALPERN, New York
JAMES HARVEY, Michigan
OLIVER P. BOLTON, Ohio
W. E. (BILL) BROCK, Tennessee
ROBERT TAFT, Jr., Ohio
JOSEPH M. McDADE, Pennsylvania
SHERMAN P. LLOYD, Utah
BURT L. TALCOTT, California
DEL CLAWSON, California

JOHN R. STARK, *Clerk and Staff Director*
JOHN E. BARRIERE, *Professional Staff Member*
ALVIN LEE MORSE, *Counsel*
ORMAN S. FINK, *Minority Staff Member*

SUBCOMMITTEE ON DOMESTIC FINANCE

WRIGHT PATMAN, Texas, Chairman

HENRY S. REUSS, Wisconsin
CHARLES A. VANIK, Ohio
CLAUDE PEPPER, Florida
JOSEPH G. MINISH, New Jersey
CHARLES L. WELTNER, Georgia
RICHARD T. HANNA, California
CHARLES H. WILSON, California

WILLIAM B. WIDNALL, New Jersey
JAMES HARVEY, Michigan
OLIVER P. BOLTON, Ohio
W. E. (BILL) BROCK, Tennessee
ROBERT TAFT, Jr., Ohio

ROBERT R. WEINTRAUB, *Senior Economist*
ROBERT A. SCHMIDT, *Investigator*
HARVEY W. GREEN, *Investigator*
STEPHEN D. KENNEDY, *Research Assistant*

II

Ex. C.

## CHAPTER III

## HOW IS MONEY CREATED?

**41. What is the fractional reserve method of banking?**

The fractional reserve method of banking originated with the gold-smiths—the predecessors of our present bankers. It is the method of banking in use today. Briefly, it is a system whereby bankers maintain as reserves only a fraction of the amount needed to meet all the claims against them. (The vast bulk of the claims against the banks are the deposits you and I hold. These are obligations which the bank must pay upon our demand.) The goldsmiths struck upon this method by noticing that the people who deposited gold with them for safekeeping only claimed a small portion of this gold at any one time. Therefore, the goldsmiths realized that they could lend out a good portion of the gold left with them. They then made loans, which in fact were not of gold but warehouse receipts for gold. These receipts circulated as money. Notice, the gold—actually the certificates—being loaned by the goldsmith was not his to lend. He did not own it. In other words, the goldsmith wrote receipts to people who were not depositing gold, i.e., to borrowers. So receipts for more gold than the goldsmith actually had in his vaults were circulating. The goldsmith had only a fraction of the amount of gold needed to meet the claims against him. This is the fractional reserve system. When the banks of the United States kept their reserves in gold, their reserves amounted to only a small fraction of the amount of money they had issued, all of which was guaranteed to be redeemable in gold.

**42. What are the advantages of the fractional reserve system?**

Fractional reserves provide banks with a source of funds which they may invest, in sound economic projects, and thus encourage business activity and economic growth.

**43. What is the major weakness of the fractional reserve system?**

Since no bank can meet all the claims on it at any one time, fractional reserve banking leaves individual banks vulnerable to runs. This is why a system of central bank reserves—with facilities to lend and transfer reserves in time of need—is necessary.

**44. What are reserves in modern American banking?**

Reserves in modern American banks are deposits—demand deposits—held by commercial banks at the Federal Reserve.

**45. Where did the commercial banks obtain their reserves?**

By and large the bulk of commercial bank reserves were created by the Federal Reserve and credited to the account of the various commercial banks which are Federal Reserve "member" banks. The Federal Reserve creates these reserves just as a bank creates checkbook money. By various devices, either limits or other means, the Federal Reserve credits a bank with bankers deposits—"reserves."

**46. Who determines how much checkbook money a bank can create on the basis of its reserves?**

The Federal Reserve System sets reserve requirements; that is, the ratio of reserves to deposits that the individual member banks must maintain. This in turn determines how many loans a bank can make, and how many securities it can buy.

**47. Where does the Federal Reserve get the money with which to create bank reserves?**

It doesn't "get" the money, it creates it. When the Federal Reserve writes a check, it is creating money. This can result in an increase in bank reserves—a demand deposit—or in cash; if the customer prefers cash, he can demand Federal Reserve notes, and the Federal Reserve will have the Treasury Department print them. The Federal Reserve is a total moneymaking machine. It can issue money or checks. And it never has a problem of making its checks good because it can obtain the $5 and $10 bills necessary to cover its check simply by asking the Treasury Department's Bureau of Engraving to print them.

**48. Who gave the Federal Reserve the power to create the money necessary to cover its checks?**

The Congress. Because this power to create money is given by the Constitution to Congress, only the Congress can delegate this power. And this it has done in creating the Federal Reserve System—an agency of Congress authorized to create money.

**49. How does the Federal Reserve change the money supply?**

First, by increasing or decreasing the amount of bank reserves which the member banks of the Federal Reserve System have to their credit on the books of the Federal Reserve banks. Second, by regulations which tell the member banks the maximum amount of bank deposits they may create per dollar of reserves.

**50. What is the formula that determines the maximum amount of money available to business and consumers?**

Expressed mathematically this is a simple formula $A \times B = C$ where: $A$ = Amount of bank reserves; $B$ = Number of dollar deposits member banks may create per each dollar of reserves; and $C$ = Total bank deposits.

**51. Can the Federal Reserve authorities change the money supply formula?**

Yes. They can change either or both parts of the formula at any-time, and they frequently do change one or both parts. There are certain limits set by the Federal Reserve Act to the changes the authorities can make. But these limits are extremely wide.

**52. Does it make any difference which part of the formula the authorities change when they wish to increase the money supply?**

Yes. Although the effect on the money supply of changing either part of the formula may be the same, the total economic effects differ depending on which part of the formula is changed. For example, when the Federal Reserve lowers reserve requirements, all of the new money is created by the commercial banks through their lending and

PAGE 11

Bank of New York. The dealer will, of course, deposit this check in his checking account, say, with the Chase Manhattan Bank. The Chase Manhattan credits the dealer's checking account with $1,000 and then sends the check to the Federal Reserve Bank of New York for payment. The Federal Reserve Bank of New York makes payment to the Chase Manhattan by crediting its reserve account with $1,000.

**59. For whom does the Federal Reserve purchase or sell gold?**

For the U.S. Treasury.

**60. Where does the gold come from?**

The gold is either newly mined or else comes from foreign central banks.

**61. Why does the Treasury buy gold?**

To add to the Nation's monetary gold stock and assure us enough gold to meet any claims from foreigners who hold dollars.

**62. Do banks have an automatic right to borrow from the Federal Reserve Bank?**

No. Member banks of the Federal Reserve System are eligible to borrow. But being eligible and obtaining a loan are two different things.

**63. How are Federal Reserve loans to banks secured?**

The law permits a Federal Reserve bank to accept a variety of good collateral to secure its loans. In practice, however, banks borrowing from the Federal Reserve System almost always put up U.S. Government securities as collateral.

**64. Do the banks of the Federal Reserve System pay for their reserves?**

No. Bank reserves cannot be paid for by private banks. They can be shifted from bank to bank after they are created. But to all intents only the Federal Reserve System itself can create or extinguish reserves. Indeed, when the Federal Reserve creates bank reserves this permits the banks to increase their loans and augment their profits.

**65. How do currency and coin enter the money supply?**

The proportion of currency and coin in circulation to the total money supply is pretty much automatic. It normally amounts to about 20 percent of the money supply, with bank deposits accounting for the other 80 percent.

**66. Who determines how much currency and coin is issued?**

Given the total money supply depends on the behavior of individuals and business firms. The amount of currency and coin in circulation depends on how convenient individuals and business firms find currency and coin rather than bank deposits in carrying on trade. As indicated, normally currency and coin make up 20 percent of the money supply.

**67. Who determines how much checkbook money shall be created?**

A committee made up of the members of the Board of Governors of the Federal Reserve System and the Presidents of the 12 Federal Reserve banks make this decision. The Open Market Committee—as it is called—decides only what the maximum amount of money may

57–240°—64— 3

PAGE 10

investing activity. This obviates the necessity of transferring Government securities from private to public hands. On the other hand, when the Federal Reserve increases reserves by, say, purchasing U.S. Government securities, the interest income on these securities goes to the Federal Reserve System. Since the Federal Reserve turns over to the U.S. Treasury most of its earnings, the net effect of increasing the money supply by increasing reserves is to favor the private banking system. So, when the Federal Reserve officials decide to increase the money supply, whether they favor the U.S. Treasury or the private banks does make a difference—millions of dollars of difference—in the amount of taxes you, I, and all other taxpayers must pay.

**53. As bank reserves rise do private banks "deposit" their reserves with the Federal Reserve?**

Collectively, private banks do not deposit a penny of their own funds, or their depositors' funds with Federal Reserve banks. Reserves are transferred from bank to bank, but nothing the banks can do will increase the total amount of reserves in the system. Practically, only the Federal Reserve System itself can do this or to permit it to occur from a gold inflow. Increasing or decreasing reserves is a conscious act of the managers of the Federal Reserve.

**54. How does the Federal Reserve create and destroy bank reserves?**

By four methods: (1) by open market operations; (2) by gold purchases for the U.S. Treasury; (3) by loans to commercial banks; and (4) by purchases of eligible paper from member banks.

**55. What are open market operations?**

They are the Federal Reserve's purchases or sale of U.S. Government securities in what is called the "open market"—in order to expand or contract bank reserves and hence the supply of money and credit available. The Federal Reserve Bank of New York conducts these transactions as agent for the entire system.

**56. What is the "open market"?**

It is composed of about 20 private dealers of U.S. Government securities with whom the Federal Reserve Bank of New York trades. Several of these dealers are big New York and Chicago banks.

**57. How much in bank reserves has been created by the Federal Reserve?**

The answer was given in early 1960 by Chairman Martin of the Federal Reserve Board. Between the end of 1917 and the end of 1959, the Federal Reserve System had created gross additions to bank reserves amounting to a total of $46 billion. Over the years, the banks had drawn down their bank reserve accounts by $28 billion by taking out currency (which was printed to meet their requests), leaving them with a net reserve balance of $18.5 billion.

**58. How does the Federal Reserve create bank reserves by open market operations?**

The step-by-step details are as follows: Let us assume that the Federal Reserve Bank of New York, acting as agent for the whole System, buys a $1,000 Government bond in the "open market." It gives the bond dealer a check for $1,000 drawn on the Federal Reserve

EX. C

Page 23

Page 22

## MONEY FACTS

22

**118. How many insured banks have failed since 1933?**

Four hundred and forty-seven (as of December 31, 1963).

**119. Where does the FDIC get its money?**

From assessments on insured banks, and interest on U.S. Government securities it holds.

**120. Where did the FDIC get money to start operations?**

The Treasury purchased $150 million of stock in the FDIC, and the Federal Reserve, on instructions of Congress bought $139 million of stock. This stock was repaid by the FDIC in 1947 at 2 percent interest.

**121. How much do the insured banks pay the FDIC?**

Insured banks pay annually a gross assessment of one-twelfth of 1 percent of their total deposits.

**122. Is the FDIC subsidized by the Federal Government?**

Yes. Although it paid back the original $289 million of stock, several subsidies remain. The fact that the FDIC gets half its total income from Government securities itself represents a sizable subsidy.

**123. What direct commitment does the Treasury have to the FDIC?**

The 1947 amendments to the Federal Deposit Insurance Corporation Act provide that the FDIC can borrow up to $3 billion from the U.S. Treasury at its discretion. The law directs the Secretary of the Treasury to put up this $3 billion any time the FDIC wants it.

**124. Does FDIC regulate and control insured banks?**

Yes. Under the provision of the act which allows the FDIC to see to it that banks do not engage in "unsafe and unsound practices in conducting business" and which allows it to lay down basic requirements for membership, the FDIC has come to regulate the banks rather completely. The FDIC can prevent banks from making investments it examiners deem undesirable. And, FDIC conservatism is making it more and more difficult for small businessmen and farmers to get the financial assistance they need.

## CHAPTER VIII

### HOW THE FEDERAL RESERVE PROVIDES PUBLIC FUNDS TO THE PRIVATE BANKS

**125. Do private banks enjoy a special relationship with the Federal Government?**

Yes, a very special relationship. The business of banks is to lend money. The profit comes from the difference between the cost of creating money and the price they charge borrowers for that money. Now the cost of creating money is negligible. Congress has delegated the power to create money to the banking system without a charge. The banks do not pay a license fee or a payment charge for their reserves. Thus the raw materials the banks use cost them nothing. Also the Government subsidizes the private banks in other ways. The banks receive free services from the Federal Reserve. Check-clearing is one example. Further, the Federal Government provides private banks with protection from competition and the hazards of failure. New national banks are not chartered unless the Federal officer in charge of such matters thinks the new bank will succeed and will not "weaken" substantially any already existing bank. Then again, the FDIC has set rigid standards for a bank to receive insurance. No new bank whether National or State chartered can very well succeed unless it obtains insurance. A basis for this insurance is that the new bank will not frace, or cause, "undue" competition.

**126. Why is the Government interested in subsidizing the private commercial banks?**

Because it furthers the public interest, up to a point. Our economy cannot function without a sound banking system and a well run, reliable money supply. The Government's concern for the banking system is actually a concern for a flourishing economy. Bank profits are necessary for a good banking system. So the Government makes provisions through its regulations that bank profits are protected.

Bank profits are only a means toward furthering the general public interest.

**127. In recent years has the Federal Reserve exhibited an undue regard for bank profits and an offhand regard for the public interest?**

Yes. In recent years the Federal Reserve has, regrettably, followed a policy which has given away billions to the private banks. It has done this by increasing the money supply largely through lowering bank reserve requirements. The Federal Reserve could have provided part of the increase in the money supply itself by purchasing Government securities. But it did not choose to do so.

23

Ex. C