**128.** *Is there an example of the Federal Reserve's letting the private banks create all the money needed to increase the money supply?*

Yes. In the early part of 1985, the Federal Reserve lowered reserve requirements in order to let private banks increase the money supply by a maximum of $10 billion. The purpose of reducing reserve requirements was to make more funds available for loans to business. The banks, instead, used the new "excess" reserves to acquire $10 billion of interest-bearing U.S. Government securities. This is an example of a "give-away"—when the Federal Reserve should have purchased Government securities instead of letting private banks do it—to the advantage of their profits and to the disadvantage of the taxpayers.

**129. What was the bond giveaway bill?**

This was a bill sponsored by the American Bankers' Association, introduced in Congress in 1985. Its purpose was to transfer $16.8 billion of Government securities from the Federal Reserve to private bankers. The goal was to reduce "enormous" Federal Reserve holdings of Government securities—and transfer them, and their interest income, to private firms. The mechanism was to permit banks to count vault cash as reserves, and use the "excess" reserves thereby created to buy bonds from the Federal Reserve. The bill was passed into law only after the House stated its firm opposition to the give-away sections of the bill, and expressed the hope that the new "excess" reserves would be used to expand business loans.

**130. Is there any reason to give private bankers more bonds?**

Since they already receive almost $2 billion in interest from the Government, and have profited steadily from reserve requirement parings, it would be wrong. Bonds should be transferred to the Federal Reserve from the private banks, not the reverse.

**131. Do private banks perform a service in buying Government bonds?**

No, because they create money—an obligation of Government—simply to buy bonds guaranteed by the Government. There is no risk involved, as there is in loans to businessmen and consumers. The banks' traditional function is to lend to private borrowers and assume the risks of creditors. Their reward for buying bonds with money they create is the "subsidized" profits they enjoy.

**132. What is the "burden" of U.S. Government bonds, held by the private banking system?**

The burden is the heavy bond interest payments, borne by the taxpayers, that go to private bankers when the same amount of money could be created by an agency of Government. Then the taxpayers would not bear this tremendous cost on Government bonds purchased with reserves given to the private bankers.

# CHAPTER IX

## WHAT IS MONETARY POLICY?

**133. What is monetary policy?**

Monetary policy deals with the operating instructions of the managers of our money factory. Monetary policy is what fits money into the structure of the economy. In specific terms it consists of the decisions the money managers make about the quantity of money, the price of money, and the availability of money. These are the quantities the money managers can manipulate precisely. Of course, the goal of a particular monetary policy at any one time is to steer the economy in the direction desired by the monetary authorities. In the broadest sense, monetary policy can be thought of as manipulation of the money supply in the pursuit of broad economic goals.

**134. What types of broad monetary policy are there?**

There are two. One is called "passive" and the other "active" monetary policy.

**135. What is "passive" monetary policy?**

A passive monetary policy is one which does not provide for any day-to-day or year-to-year decisions by money managers to influence the volume or kinds of economic activity. The money supply is not regulated to achieve a specific economic target. This does not mean that interest rates do not move up or down. They do. But these moves of the interest rate do not result from any deliberate action by the monetary authorities.

**136. What rules guide the money supply in the passive case?**

Broadly speaking, they are automatic, akin to the rules a thermostat follows in controlling a room's temperature. For example, the system can be told to increase the money supply by, say, 3 percent a year. Or, more complicated rules can be devised.

**137. What is "active" monetary policy?**

Active monetary policy is the decision of the Government to give its monetary agencies the power and the responsibility to influence the economy, through deliberate and constant adjustments of the monetary mechanism. With active monetary policy, the prevailing level of the money supply and of interest rates at any time, results from a conscious choice by the central bank.

**138. What kind of monetary policy has the United States followed in recent years?**

An "active" policy.

25

EX. C.

# EXHIBIT D
(Copy of a Note endorsed by Countrywide)



MIN: 100112065696687926
MERS Phone: 1-888-679-6377

# ADJUSTABLE RATE NOTE

LOAN NO.: 40306413

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

APRIL 29, 2005                              PHOENIX                    ARIZONA
   [Date]                                     [City]

                              588 EAST GAIL DRIVE, GILBERT, AZ 85296
                                      [Property Address]

*I, the undersigned, hereby certify this to be a true and correct copy. American Title Service Agency, LLC. By*

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   340,000.00   (this amount is called "Principal"), plus interest, to the order of Lender.  Lender is
MIT LENDING

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note.  Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate
Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of      1.000      %.  The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates
The interest rate I will pay may change on the first day of          JUNE, 2005          , and on that day every month thereafter.  Each date on which my interest rate could change is called an "Interest Rate Change Date."  The new rate of interest will become effective on each Interest Rate Change Date.

### (C) Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index.  The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields").  The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.  The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding   TWO AND ONE HALF          percentage point(s) (      2.600      %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  This rounded amount will be my new interest rate until the next Interest Rate Change Date.  My interest rate will never be greater than    10.950   % .

CONV
● ARM PayOption Note
FE-4270  (0209)                              Page 1 of 5                    Initials:

LENDER SUPPORT SYSTEMS INC. COU-4270.COU (1/05)

EX. D.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on          JUNE, 2005
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on          MAY 01, 2035                          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   MIT LENDING
33 MAIDEN LANE 6TH FLOOR, NEW YORK, NY 10038-
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $          1,093.57          . This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of          JUNE, 2006          , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new required monthly payment will be the lesser of the Limited Payment and the Full Payment. I also have the option each month to pay more than the Limited Payment up to and including the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to   ONE HUNDRED FIFTEEN AND 000/1000THS   percent ( 115.000  %) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the current interest rate.

**(G) Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

CONV
● ARM PayOption Note
FE-4270  (0200)                                        Page 2 of 5                                        Initials: _____



### 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

### 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of                    15
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
         5.000              % of my overdue payment of principal and interest. I will pay this late charge promptly but only once
on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

### 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

CONV
● ARM PayOption Note
FE-4270  (0209)

Initials: _NRK_ /_DJL_

EX. D

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
ANN R. KELSEY                    -Borrower        DENNIS J. KELSEY                 -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

[Sign Original Only]

CONV
● ARM PayOption Note
FE-4270  (0208)                        Page 5 of 5

Ex. D.

# ALLONGE TO NOTE

MIT Loan #: 40306413

Note Date: APRIL 29, 2005

Executed By: DENNIS J. AND ANN R. KELSEY

Property Address:   588 EAST GAIL DRIVE
                    GILBERT, AZ 85296

Note Amount:      $340,000.00

Pay to the order of  : Countrywide Document Custody
                       Services, a Division of Treasury Bank,
                       N.A.

Without Recourse

MIT Lending

By
     Typed Name: Betsy Perrucci
     Title:  Assistant Secretary

EX. D.

# EXHIBIT E

Certified copy of "Modern Money Mechanics"
(Selected pages 2 to 7 only; and Last page "Published by the
Federal Reserve Bank of Chicago")

EX. E

# *Modern Money Mechanics*

**A Workbook on Bank Reserves and Deposit Expansion**

**Federal Reserve Bank of Chicago**



# Modern Money Mechanics

*The purpose of this booklet is to describe the basic process of money creation in a "fractional reserve" banking system. The approach taken illustrates the changes in bank balance sheets that occur when deposits in banks change as a result of monetary action by the Federal Reserve System — the central bank of the United States. The relationships shown are based on simplifying assumptions. For the sake of simplicity, the relationships are shown as if they were mechanical, but they are not, as is described later in the booklet. Thus, they should not be interpreted to imply a close and predictable relationship between a specific central bank transaction and the quantity of money.*

*The introductory pages contain a brief general description of the characteristics of money and how the U.S. money system works. The illustrations in the following two sections describe two processes: first, how bank deposits expand or contract in response to changes in the amount of reserves supplied by the central bank; and second, how those reserves are affected by both Federal Reserve actions and other factors. A final section deals with some of the elements that modify, at least in the short run, the simple mechanical relationship between bank reserves and deposit money.*

Money is such a routine part of everyday living that its existence and acceptance ordinarily are taken for granted. A user may sense that money must come into being either automatically as a result of economic activity or as an outgrowth of some government operation. But just *how* this happens all too often remains a mystery.

## What Is Money?

If money is viewed simply as a tool used to facilitate transactions, only those media that are readily accepted in exchange for goods, services, and other assets need to be considered. Many things — from stones to baseball cards — have served this monetary function through the ages. Today, in the United States, money used in transactions is mainly of three kinds — currency (paper money and coins in the pockets and purses of the public); demand deposits (non-interest-bearing checking accounts in banks); and other checkable deposits, such as negotiable order of withdrawal (NOW) accounts, at all depository institutions, including commercial and savings banks, savings and loan associations, and credit unions. Travelers checks also are included in the definition of transactions money. Since $1 in currency and $1 in checkable deposits are freely convertible into each other and both can be used directly for expenditures, they are money in equal degree. However, only the cash and balances held by the nonbank public are counted in the money supply. Deposits of the U.S. Treasury, depository institutions, foreign banks and official institutions, as well as vault cash in depository institutions are excluded.

This transactions concept of money is the one designated as M1 in the Federal Reserve's money stock statistics. Broader concepts of money (M2 and M3) include M1 as well as certain other financial assets (such as savings and time deposits at depository institutions and shares in money market mutual funds) which are relatively liquid but believed to represent principally investments to their holders rather than media of exchange. While funds can be shifted fairly easily between transaction balances and these other liquid assets, the money-creation process takes place principally through transaction accounts. In the remainder of this booklet, "money" means M1.

The distribution between the currency and deposit components of money depends largely on the preferences of the public. When a depositor cashes a check or makes a cash withdrawal through an automatic teller machine, he or she reduces the amount of deposits and increases the amount of currency held by the public. Conversely, when people have more currency than is needed, some is returned to banks in exchange for deposits.

While currency is used for a great variety of small transactions, most of the dollar amount of money payments in our economy are made by check or by electronic

EX. E

transfer between deposit accounts. Moreover, currency is a relatively small part of the money stock. About 69 percent, or $623 billion, of the $898 billion total money stock in December 1991, was in the form of transaction deposits, of which $290 billion were demand and $333 billion were other checkable deposits.

## What Makes Money Valuable?

In the United States neither paper currency nor deposits have value as commodities. Intrinsically, a dollar bill is just a piece of paper, deposits merely book entries. Coins do have some intrinsic value as metal, but generally far less than their face value.

What, then, makes these instruments — checks, paper money, and coins — acceptable at face value in payment of all debts and for other monetary uses? Mainly, it is the confidence people have that they will be able to exchange such money for other financial assets and for real goods and services whenever they choose to do so.

Money, like anything else, derives its value from its *scarcity* in relation to its usefulness. Commodities or services are more or less valuable because there are more or less of them relative to the amounts people want. Money's usefulness is its unique ability to command other goods and services and to permit a holder to be constantly ready to do so. How much money is demanded depends on several factors, such as the total volume of transactions in the economy at any given time, the payments habits of the society, the amount of money that individuals and businesses want to keep on hand to take care of unexpected transactions, and the foregone earnings of holding financial assets in the form of money rather than some other asset.

Control of the *quantity* of money is essential if its value is to be kept stable. Money's real value can be measured only in terms of what it will buy. Therefore, its value varies inversely with the general level of prices. Assuming a constant rate of use, if the volume of money grows more rapidly than the rate at which the output of real goods and services increases, prices will rise. This will happen because there will be more money than there will be goods and services to spend it on at prevailing prices. But if, on the other hand, growth in the supply of money does not keep pace with the economy's current production, then prices will fall, the nation's labor force, factories, and other production facilities will not be fully employed, or both.

Just how large the stock of money needs to be in order to handle the transactions of the economy without exerting undue influence on the price level depends on how intensively money is being used. Every transaction deposit balance and every dollar bill is a part of somebody's spendable funds at any given time, ready to move to other owners as transactions take place. Some holders spend money quickly after they get it, making these funds available for other uses. Others, however, hold money for longer periods. Obviously, when some money remains idle, a larger total is needed to accomplish any given volume of transactions.

## Who Creates Money?

Changes in the quantity of money may originate with actions of the Federal Reserve System (the central bank), depository institutions (principally commercial banks), or the public. The major control, however, rests with the central bank.

The actual process of money creation takes place primarily in banks.[1] As noted earlier, checkable liabilities of banks are money. These liabilities are customers' accounts. They increase when customers deposit currency and checks and when the proceeds of loans made by the banks are credited to borrowers' accounts.

In the absence of legal reserve requirements, banks can build up deposits by increasing loans and investments so long as they keep enough currency on hand to redeem whatever amounts the holders of deposits want to convert into currency. This unique attribute of the banking business was discovered many centuries ago.

It started with goldsmiths. As early bankers, they initially provided safekeeping services, making a profit from vault storage fees for gold and coins deposited with them. People would redeem their "deposit receipts" whenever they needed gold or coins to purchase something, and physically take the gold or coins to the seller who, in turn, would deposit them for safekeeping, often with the same banker. Everyone soon found that it was a lot easier simply to use the deposit receipts directly as a means of payment. These receipts, which became known as notes, were acceptable as money since whoever held them could go to the banker and exchange them for metallic money.

Then, bankers discovered that they could make loans merely by giving their promises to pay, or bank notes, to borrowers. In this way, banks began to create money. More notes could be issued than the gold and coin on hand because only a portion of the notes outstanding would be presented for payment at any one time. Enough metallic money had to be kept on hand, of course, to redeem whatever volume of notes was presented for payment.

Transaction deposits are the modern counterpart of bank notes. It was a small step from printing notes to making book entries crediting deposits of borrowers, which the borrowers in turn could "spend" by writing checks, thereby "printing" their own money.

---

[1] In order to describe the money-creation process as simply as possible, the term "bank" used in this booklet should be understood to encompass all depository institutions. Since the Depository Institutions Deregulation and Monetary Control Act of 1980, all depository institutions have been permitted to offer interest-bearing transaction accounts to certain customers. Transaction accounts (interest-bearing as well as demand deposits on which payment of interest is still legally prohibited) at all depository institutions are subject to the reserve requirements set by the Federal Reserve. Thus all such institutions, not just commercial banks, have the potential for creating money.

## What Limits the Amount of Money Banks Can Create?

If deposit money can be created so easily, what is to prevent banks from making too much — more than sufficient to keep the nation's productive resources fully employed without price inflation? Like its predecessor, the modern bank must keep available, to make payment on demand, a considerable amount of currency and funds on deposit with the central bank. The bank must be prepared to convert deposit money into currency for those depositors who request currency. It must make remittance on checks written by depositors and presented for payment by other banks (settle adverse clearings). Finally, it must maintain legally required reserves, in the form of vault cash and/or balances at its Federal Reserve Bank, equal to a prescribed percentage of its deposits.

The public's demand for currency varies greatly, but generally follows a seasonal pattern that is quite predictable. The effects on bank funds of these variations in the amount of currency held by the public usually are offset by the central bank, which replaces the reserves absorbed by currency withdrawals from banks. (Just how this is done will be explained later.) For all banks taken together, there is no net drain of funds through clearings. A check drawn on one bank normally will be deposited to the credit of another account, if not in the same bank, then in some other bank.

These operating needs influence the minimum amount of reserves an individual bank will hold voluntarily. However, as long as this minimum amount is less than what is legally required, operating needs are of relatively minor importance as a restraint on aggregate deposit expansion in the banking system. Such expansion cannot continue beyond the point where the amount of reserves that all banks have is just sufficient to satisfy legal requirements under our "fractional reserve" system. For example, if reserves of 20 percent were required, deposits could expand only until they were five times as large as reserves. Reserves of $10 million could support deposits of $50 million. The lower the percentage requirement, the greater the deposit expansion that can be supported by each additional reserve dollar. Thus, the legal reserve ratio together with the dollar amount of bank reserves are the factors that set the upper limit to money creation.

## What Are Bank Reserves?

Currency held in bank vaults may be counted as legal reserves as well as deposits (reserve balances) at the Federal Reserve Banks. Both are equally acceptable in satisfaction of reserve requirements. A bank can always obtain reserve balances by sending currency to its Reserve Bank and can obtain currency by drawing on its reserve balance. Because either can be used to support a much larger volume of deposit liabilities of banks, currency in circulation and reserve balances together are often referred to as "high-powered money" or the "monetary base." Reserve balances and vault cash in banks, however, are not counted as part of the money stock held by the public.

For individual banks, reserve accounts also serve as working balances.[2] Banks may increase the balances in their reserve accounts by depositing checks and proceeds from electronic funds transfers as well as currency. Or they may draw down these balances by writing checks on them or by authorizing a debit to them in payment for currency, customers' checks, or other funds transfers.

Although reserve accounts are used as working balances, each bank must maintain, on the average for the relevant reserve maintenance period, reserve balances at the Reserve Bank and vault cash which together are equal to its required reserves, as determined by the amount of its deposits in the reserve computation period.

## Where Do Bank Reserves Come From?

Increases or decreases in bank reserves can result from a number of factors discussed later in this booklet. From the standpoint of money creation, however, the essential point is that the reserves of banks are, for the most part, liabilities of the Federal Reserve Banks, and net changes in them are largely determined by actions of the Federal Reserve System. Thus, the Federal Reserve, through its ability to vary both the total volume of reserves and the required ratio of reserves to deposit liabilities, influences banks' decisions with respect to their assets and deposits. One of the major responsibilities of the Federal Reserve System is to provide the total amount of reserves consistent with the monetary needs of the economy at reasonably stable prices. Such actions take into consideration, of course, any changes in the pace at which money is being used and changes in the public's demands for cash balances.

The reader should be mindful that deposits and reserves tend to expand simultaneously and that the Federal Reserve's control often is exerted through the marketplace as individual banks find it either cheaper or more expensive to obtain their required reserves, depending on the willingness of the Fed to support the current rate of credit and deposit expansion.

While an individual bank can obtain reserves by bidding them away from other banks, this cannot be done by the banking system as a whole. Except for reserves borrowed temporarily from the Federal Reserve's discount window, as is shown later, the supply of reserves in the banking system is controlled by the Federal Reserve.

Moreover, a given increase in bank reserves is not necessarily accompanied by an expansion in money equal to the theoretical potential based on the required ratio of reserves to deposits. What happens to the quantity of

---

[2]Part of an individual bank's reserve account may represent its reserve balance used to meet its reserve requirements while another part may be its required clearing balance on which earnings credits are generated to pay for Federal Reserve Bank services.

money will vary, depending upon the reactions of the banks and the public. A number of slippages may occur. What amount of reserves will be drained into the public's currency holdings? To what extent will the increase in total reserves remain unused as excess reserves? How much will be absorbed by deposits or other liabilities not defined as money but against which banks might also have to hold reserves? How sensitive are the banks to policy actions of the central bank? The significance of these questions will be discussed later in this booklet. The answers indicate why changes in the money supply may be different than expected or may respond to policy action only after considerable time has elapsed.

In the succeeding pages, the effects of various transactions on the quantity of money are described and illustrated. The basic working tool is the "T" account, which provides a simple means of tracing, step by step, the effects of these transactions on both the asset and liability sides of bank balance sheets. Changes in asset items are entered on the left half of the "T" and changes in liabilities on the right half. For any one transaction, of course, there must be at least two entries in order to maintain the equality of assets and liabilities.

Ex. E

# *Bank Deposits—How They Expand or Contract*

Let us assume that expansion in the money stock is desired by the Federal Reserve to achieve its policy objectives. One way the central bank can initiate such an expansion is through purchases of securities in the open market. Payment for the securities adds to bank reserves. Such purchases (and sales) are called "open market operations."

How do open market purchases add to bank reserves and deposits? Suppose the Federal Reserve System, through its trading desk at the Federal Reserve Bank of New York, buys $10,000 of Treasury bills from a dealer in U.S. government securities.[3] In today's world of computerized financial transactions, the Federal Reserve Bank pays for the securities with an "electronic" check drawn on itself.[4] Via its "Fedwire" transfer network, the Federal Reserve notifies the dealer's designated bank (Bank A) that payment for the securities should be credited to (deposited in) the dealer's account at Bank A. At the same time, Bank A's reserve account at the Federal Reserve is credited for the amount of the securities purchase. The Federal Reserve System has added $10,000 of securities to its assets, which it has paid for, in effect, by *creating* a liability on itself in the form of bank reserve balances. These reserves on Bank A's books are matched by $10,000 of the dealer's deposits that did not exist before. *See illustration 1.*

### How the Multiple Expansion Process Works

If the process ended here, there would be no "multiple" expansion, i.e., deposits and bank reserves would have changed by the same amount. However, banks are required to maintain reserves equal to only a fraction of their deposits. Reserves in excess of this amount may be used to increase earning assets — loans and investments. Unused or excess reserves earn no interest. Under current regulations, the reserve requirement against most transaction accounts is 10 percent.[5] Assuming, for simplicity, a uniform 10 percent reserve requirement against all transaction deposits, and further assuming that all banks attempt to remain fully invested, we can now trace the process of expansion in deposits which can take place on the basis of the *additional* reserves provided by the Federal Reserve System's purchase of U.S. government securities.

The expansion process may or may not begin with Bank A, depending on what the dealer does with the money received from the sale of securities. If the dealer immediately writes checks for $10,000 and all of them are deposited in other banks, Bank A loses both deposits and reserves and shows no net change as a result of the System's open market purchase. However, other banks have received them. Most likely, a part of the initial deposit will remain with Bank A, and a part will be shifted to other banks as the dealer's checks clear.

It does not really matter where this money is at any given time. The important fact is that *these deposits do not disappear.* They are in some deposit accounts at all times. All banks together have $10,000 of deposits and reserves that they did not have before. However, they are not required to keep $10,000 of reserves against the $10,000 of deposits. All they need to retain, under a 10 percent reserve requirement, is $1,000. The remaining $9,000 is "excess reserves." This amount can be loaned or invested. *See illustration 2.*

If business is active, the banks with excess reserves probably will have opportunities to loan the $9,000. Of course, they do not really pay out loans from the money they receive as deposits. If they did this, no additional money would be created. What they do when they make loans is to accept promissory notes in exchange for credits to the borrowers' transaction accounts. Loans (assets) and deposits (liabilities) both rise by $9,000. Reserves are unchanged by the loan transactions. But the deposit credits constitute new additions to the total deposits of the banking system. *See illustration 3.*

[3]Dollar amounts used in the various illustrations do not necessarily bear any resemblance to actual transactions. For example, open market operations typically are conducted with many dealers and in amounts totaling several billion dollars.

[4]Indeed, many transactions today are accomplished through an electronic transfer of funds between accounts rather than through issuance of a paper check. Apart from the timing of posting, the accounting entries are the same whether a transfer is made with a paper check or electronically. The term "check," therefore, is used for both types of transfers.

[5]For each bank, the reserve requirement is 3 percent on a specified base amount of transaction accounts and 10 percent on the amount above this base. Initially, the Monetary Control Act set this base amount — called the "low reserve tranche" — at $25 million, and provided for it to change annually in line with the growth in transaction deposits nationally. The low reserve tranche was $41.1 million in 1991 and $42.2 million in 1992. The Garn-St Germain Act of 1982 further modified these requirements by exempting the first $2 million of reservable liabilities from reserve requirements. Like the low reserve tranche, the exempt level is adjusted each year to reflect growth in reservable liabilities. The exempt level was $3.4 million in 1991 and $3.6 million in 1992.



# ■ *Deposit Expansion*

---

**1**  When the Federal Reserve Bank purchases government securities, bank reserves increase.  This happens because the seller of the securities receives payment through a credit to a designated deposit account at a bank (Bank A) which the Federal Reserve effects by crediting the reserve account of Bank A.

| FEDERAL RESERVE BANK | | | | BANK A | | |
|---|---|---|---|---|---|---|
| **Assets** | | **Liabilities** | | **Assets** | | **Liabilities** |
| U.S. government securities | + 10,000 | Reserve accounts: Bank A  + 10,000 ◄──► | | Reserves with F.R. Banks | + 10,000 | Customer deposit  + 10,000 |

*The customer deposit at Bank A likely will be transferred, in part, to other banks and quickly loses its identity amid the huge interbank flow of deposits.*

---

**2**  As a result, all banks taken together now have "excess" reserves on which deposit expansion can take place.

| | | |
|---|---|---|
| Total reserves gained from new deposits ..................... | | 10,000 |
| less:  Required against new deposits | | |
| (at 10 percent) ........................... | | 1,000 |
| equals:  Excess reserves ....................................... | | 9,000 |

---

## *Expansion—Stage 1*

---

**3**  Expansion takes place only if the banks that hold these excess reserves (Stage 1 banks) increase their loans or investments.  Loans are made by crediting  the borrower's deposit account, i.e., by creating additional deposit money.

| STAGE 1 BANKS | | |
|---|---|---|
| **Assets** | | **Liabilities** |
| Loans | + 9,000 | Borrower deposits  + 9,000 |

---

EX. E

Copies of this workbook
are available from:
Public Information Center
Federal Reserve Bank of Chicago
P.O. Box 834
Chicago, IL  60690-0834
[312] 322-5111

This publication originally was written
by Dorothy M. Nichols in May 1961.
The June 1992 revision was prepared
by Anne Marie L. Gonczy

REVISED
May 1968
September 1971
June 1975
October 1982
June 1992

February 1994 40M
Printed in U.S.A.

♲ Printed on recycled paper



FEDERAL RESERVE BANK
OF CHICAGO



# EXHIBIT F

Copy of a Promissory Note
(Richard Webster to World Savings Bank
with endorsement stamp - last page)



1   Christopher A. Carr  (#44444)
        ccarr@afrct.com
2   Lynette Gridiron Winston (#151003)
        lwinston@afrct.com
3   ANGLIN, FLEWELLING, RASMUSSEN,
        CAMPBELL & TRYTTEN LLP
4   199 S. Los Robles Avenue, Suite 600
    Pasadena, California  91101-2459
5   Tel: (626) 535-1900; Fax: (626) 577-7764

6   Attorneys for Defendant
    WACHOVIA MORTGAGE, FSB, f/k/a
7   WORLD SAVINGS BANK, FSB,
    erroneously sued as Wells Fargo Bank,
8   fka Wachovia Mortgage fka World Savings

9

10                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                          FOR THE COUNTY OF RIVERSIDE

12  RICHARD WEBSTER AND NANCI        )   Case No. RIC 527237
    WEBSTER,                         )
13                                   )   [Assigned to the Hon. Mark E. Johnson,
                    Plaintiffs,      )   Dept. 05 for all purposes]
14                                   )
         vs.                         )   REPLY OF DEFENDANT WACHOVIA
15                                   )   MORTGAGE, FSB IN SUPPORT OF ITS
                                     )   MOTION TO EXPUNGE LIS PENDENS AND
16  WELLS FARGO BANK, FKA WACHOVIA   )   MECHANIC'S LIEN; DECLARATION OF
    MORTGAGE, FKA WORLD SAVINGS,     )   LYNETTE GRIDIRON WINSTON
17  CAL-WESTERN RECONVEYANCE         )
    CORP., AS TRUSTEE, and DOES 1 through )
18  20, INCLUSIVE,                   )   Date:  October 14, 2009
                                     )   Time: 8:30 a.m.
19                  Defendants.      )   Dept.  05
                                     )
20

21  TO PLAINTIFFS:

22          Defendant Wachovia Mortgage FSB, formerly known as World Savings Bank, FSB,

23  erroneously sued as "Wells Fargo Bank, fka Wachovia Mortgage, fka World Savings" (hereinafter

24  "Wachovia"), respectfully submits its reply in support of its previously filed Motion to Expunge

25  Notice of Pendency of Action and Mechanic's Lien:

26          1.  <u>THE NOTICE OF PENDENCY OF ACTION SHOULD BE EXPUNGED</u>

27          Plaintiffs' opposition does not raise any issues that would warrant denying Wachovia's

28  motion to expunge the notice of pendency of action and the mechanic's lien.  The Opposition does

    REPLY OF DEFENDANT WACHOVIA MORTGAGE, FSB IN SUPPORT OF MOTION TO EXPUNGE

EX. F

1  not address either of the two reasons advanced by Wachovia in support of its motion; namely, (a)

2  the complaint does not state a "real property claim" within the meaning of CCP § 405.31, and (b)

3  plaintiffs can not demonstrate the "probable validity" of any (supposed) real property claim within

4  the meaning of CCP § 405.32. Rather, the Opposition seems to focus entirely on the contention

5  that Wachovia did not have standing to foreclose because it did not produce the original note.

6       Plaintiffs cite numerous federal authority in support of their contention that Wachovia is

7  required to produce the original note. (Opp. ¶¶6, 7, pp.3:12-4:15). However, these cases held that

8  the secured party **must take actual possession** of the security instrument (e.g. Note and/or Deed of

9  Trust) **in order to perfect the security instrument**. *See, e.g., In re Staff Mrtg. & Inv. Corp.*, 550

10  F.2d 1228, 1230 (9th Cir. 1977) ("California Commercial Code § 9304(1) states: "A security

11  interest in chattel paper or negotiable documents may be perfected by filing. A security interest in

12  instruments . . . can be perfected only by the secured party's taking possession, . . ." (emphasis

13  added)) (cited in Opp. pp. 1:22, 3:17, 28, 4:1, 9).

14       In *Bear v. Coben (In re Golden Plan of Cal., Inc.)*, 829 F.2d 705, 709 (9th Cir. 1986) (cited

15  in Opp. p.4:9) the court noted:

16       In Huffman v. Wikle (In re Staff Mortgage & Investment Corp.), 550 F.2d
     1228 (9th Cir. 1977) ("Huffman"), and Greiner v. Wilke (In re Staff

17       Mortgage & Investment Corp.), 625 F.2d 281 (9th Cir. 1980) ("Staff"),
     this court held that: 1) collateral notes and trust deeds are "instruments" for

18       the purposes of Division 9; and 2) the failure to take actual possession of
     these instruments by the secured party caused the security interests to be

19       unperfected. See Huffman, 550 F.2d at 1230-31; Staff, 625 F.2d at 283.

20

21       Thus, these cases only held that the secured creditor must take possession of the security

22  instrument in order to perfect such instrument. The security instrument cannot be left in the

23  possession of the debtor. Here, plaintiffs have not alleged, nor can they allege, that World Savings

24  Bank did not take possession of the Note and Deed of Trust, but instead left such documents in

25  plaintiffs' possession.

26       Plaintiffs do not contend that the Note and Deed of Trust were not perfected, they simply

27  contend that Wachovia did not produce the original note and therefore lacks standing to foreclose.

28  However, as briefed in the Motion, there is no requirement that Wachovia provide the original


EX. F

1   note prior to the foreclosure sale. "Cal. Civ. Code § 2924 outlines the requirements for

2   nonjudicial foreclosures in California, and does not include providing the original note prior to the

3   sale. Additionally, under California law, an 'allegation that the trustee did not have the original

4   note or had not received it is insufficient to render the foreclosure proceeding invalid.'" *Quintos*

5   *v. Decision One Mortg. Co., LLC*, 2008 U.S. Dist. LEXIS 104503, *7 (S.D. Cal. 2008) (Court

6   rejected a similar contention that defendants lacked standing to foreclose because they failed to

7   disclose the loan ownership status); *Cal. Trust Co. v. Smead Inv. Co.*, 6 Cal.App.2d 432, 435

8   (1935). Thus, plaintiffs have no basis for challenging the foreclosure sale that took place on May

9   22, 2009 and no basis for defeating this motion to expunge.

10         Moreover, in a showing of good faith, Wachovia hereby provides a copy of the Original

11   Note signed by plaintiff Richard Webster, and will produce the Original Note at the hearing on

12   this motion. (Declaration of Lynette Gridiron Winston ¶2, Exh. A).

13         Finally, Wachovia instituted non-judicial foreclosure proceedings. (See Wachovia's

14   previously filed Request for Judicial Notice In Support of Motion to Expunge, Exhs. B-D). Thus,

15   there is no requirement that Wachovia obtain a court order prior to holding a foreclosure sale.

16      2.   <u>THE MECHANICS LIEN IS UNENFORCEABLE AND SHOULD BE EXPUNGED</u>

17         Plaintiffs' opposition does not dispute any of the issues raised by Wachovia to expunge the

18   mechanic's lien recorded by plaintiff Richard Webster. Thus, plaintiffs concede that the

19   mechanic's lien should be expunged.

20      3.   <u>CONCLUSION</u>

21         In short, plaintiffs have totally failed to carry their burden of proof on establishing any real

22   property claim or the probable validity of such claim, even if one assumes they have stated a real

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

REPLY OF DEFENDANT WACHOVIA MORTGAGE, FSB IN SUPPORT OF MOTION TO EXPUNGE


Ex. F

1 | property claim in the first place. For the foregoing reasons, Wachovia requests an order expunging

2 | the *Lis Pendens* and the Mechanic's Lien and an order for $2,520.00 in attorneys' fees.

3 | Respectfully submitted,

4 | Dated: October 5, 2009 | ANGLIN, FLEWELLING, RASMUSSEN,
   | CAMPBELL & TRYTTEN LLP

5 |

6 | By: _Lynette Gridiron Winston_

7 | Lynette Gridiron Winston
   | Attorneys for Defendant

8 | WACHOVIA MORTGAGE, FSB, f/k/a WORLD
   | SAVINGS BANK, FSB, erroneously sued as Wells

9 | Fargo Bank, fka Wachovia Mortgage fka World
   | Savings

10 |

REPLY OF DEFENDANT WACHOVIA MORTGAGE, FSB IN SUPPORT OF MOTION TO EXPUNGE

Ex. F

# DECLARATION OF LYNETTE GRIDIRON WINSTON

I, Lynette Gridiron Winston, declare:

1.     I am an attorney at law licensed to practice before this Court and am employed by the law firm of Anglin, Flewelling, Rasmussen, Campbell & Trytten LLP, counsel for defendant Wachovia Mortgage FSB, formerly known as World Savings Bank, FSB, erroneously named as Wells Fargo Bank, fka Wachovia Mortgage, fka World Savings ("Wachovia"). I make this declaration in support of Wachovia's reply in support of its motion to expunge the *Lis Pendens* and Mechanic's Lien recorded by plaintiffs Richard Webster and Nanci Webster against real property commonly described as 2058 Dove Court, Corona, California 92882 (the "Property"). I have personal knowledge of the matters set forth below.

2.     Attached hereto as Exhibit A is a true and correct copy of the original Adjustable Rate Mortgage Note, dated November 22, 2005 and signed by plaintiff Richard Webster. I will produce the original Note at the hearing on this motion. I received the Note from Wachovia in the course of our representation of it in this action.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct. If called on to testify to the foregoing, I would and could competently testify thereto.

Executed this 5th day of October, 2009, at Pasadena, California.

_Lynette Gridiron Winston_
Lynette Gridiron Winston



# EXHIBIT A





DEC
Teresa

### BEGINNING OF BATCH
### FOR LOAN

### HEADER SHEET FOR

### LOAN NUMBER:

**0041466525**

RICHARD WEBSTER

Received
NOV 29 2005
Jodi Linkmeyer

DEC 0 9 2005

**Patricia Banda**

## ATTENTION CLOSING AGENT,
## PLEASE RETURN THIS DOCUMENT
## WITH THE PACKAGE OF SIGNED
## DOCUMENTS REFERRED TO ON
## THE CLOSING INSTRUCTIONS
## PAGE 2, ITEM 9.

### IMAGING

NOV 29 2005

MATTHEW GUTIERREZ



0 0 4 1 4 6 6 5 2 5

GF480A (2003-03-1)



WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER: **0041466525**                          DATE: **November 22, 2005**

BORROWER(S):  **RICHARD WEBSTER, A MARRIED MAN**  sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **2058 DOVE CT, CORONA, CA  92882-3773**

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$432,800.00** , called "Principal," plus interest, to the order of the Lender. The Lender is **WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK,, ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred.

### 2.  INTEREST

**(A)   Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of **6.370%**. The interest rate I will pay may change as described in this Section 2. Interest will be charged on the basis of a twelve month year and a thirty day month.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)   Interest Change Dates**

The interest rate I will pay may change on the **15th** day of **January, 2006** and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C)   Interest Rate Limit**

My lifetime maximum interest rate limit is **11.950%**, called "Lifetime Rate Cap."

LENDER'S USE ONLY



0041466525

**(D)  Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

**(E)  Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **3.400** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F)  Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available.  For purposes of this Section 2(F) the Index is not "available" if:  (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note.  The selection of the alternative index shall be at Lender's sole discretion.  The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator.  The Lender will give me notice of the alternative index.

**3.  PAYMENTS**

**(A)  Time and Place of Payments**

I will pay Principal and interest by making payments every month.

I will make my monthly payments on the **15th** day of each month beginning on **JANUARY 15, 2006**. I will make these payments every month until I have paid (i) all the Principal and interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **December 15, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **1,643.35**. This amount will change as described in Sections 3(C) and 3(D) below. My initial  monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C)  Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the **15th** day of **JANUARY, 2007** and on that day every **12th**  month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Payment Changes**

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

SD2538 (2004-03-1)     [801 (2004-03-1)]              ADJUSTABLE NOTE                          CA
COSI                                                  Page 2


EX. F.

0041466525

**(E)  Deferred Interest; Additions to My Unpaid Principal**

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)  Payment Cap Limitation; Exceptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)  Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.  FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so.  The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing.  I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal.  During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

**6.  MAXIMUM LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If the Lender has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be **5.00%** of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

SD253C (2004-03-1)                     ADJUSTABLE NOTE                                    CA
                                             Page 3

*EX .F.*

0041466525

**(B) Default**

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C) Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(D) No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E) Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **2058 DOVE CT, CORONA, CA 92882-377**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph 26:

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

*Acceleration of Payment of Sums Secured.* Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

SD253D (2004-03-1)        ADJUSTABLE NOTE             CA

Page 4



0041466525

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

      (i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

      (ii)    Lender approves the creditworthiness of the transferee in writing;

      (iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

      (iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender, and

      (v)    the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

**12. GOVERNING LAW; SEVERABILITY**

    This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

**13. CLERICAL ERRORS**

    In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

**14. LOST, STOLEN OR MUTILATED DOCUMENTS**

    If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

<br>

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**



SIGNATURE PAGE

0041466525

**NOTICE TO BORROWER(S):**

**BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.**

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED**

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

BORROWER(S):

_____ (Seal)
RICHARD WEBSTER



PAY TO THE ORDER OF
THE BANK OF NEW YORK

WORLD SAVINGS BANK
A FEDERAL SAVINGS BANK

CANCELLED

BY: _____
NAME: CRAIG SWONSON
TITLE: CUSTODIAN OF RECORDS

EX. F

# EXHIBIT G
## Request for debt validation
#### (Qualified Written Request & Debt Validation/Offer of Performance)



Date: September 24, 2010

Certified Mail number: <u>7010 0290 0001 7828 4254</u>

JP MORGAN CHASE BANK, NA
(Chase Home Finance, LLC)
270 PARK AVENUE
New York, New York 10017

**Loan Numbers:    3062191972 (1st Loan) and 419408611094 (2nd Loan)
   - Referred herein (combined) as "Loan"
Borrower(s) Name:  Lawrence M. Asuncion and Maria Estrella C. Asuncion
Property Address:    1156 Barcelona Drive, Pacifica, California 94044**

**RE: QUALIFIED WRITTEN REQUEST/OFFER OF PERFORMANCE FOR JP MORGAN
CHASE BANK, NA, Creditor Claim/Notice of Intent to Enforce Rights under State and
Federal Law RICO Title 18 USC Sections 1961, 1962 Et Seq and Sections 891-894 for
Extortionate Credit Transactions/ Loan numbers 3062191972 and 419408611094.**

   *NOTE: The Promissory Notes and Deed of Trusts (plural) related to the above
   Mortgages and/ or Loan Numbers are also referred herein as Promissory Note and
   Deed of Trust, respectively, in the singular.*

Sir or Madam:

You are in receipt of notice under the authority of The Fair Debt Collections Practices Act regarding
your file/ loan numbers 3062191972 and 419408611094. This debt is in dispute. I am acting on
behalf myself and others similarly situated who are co-owners of the property, which has been
encumbered under the above loan agreement(s). It is not now, nor has it ever been my intention to
avoid paying any obligation that I lawfully owe. In order for me to make arrangements to pay an
obligation which I may owe, please document and verify the "debt" by complying in good faith with
this request for validation and notice that I dispute part of, or all of the alleged debt.

This document is my good faith offer of performance to pay any amount of money you say that I
owe up to and including the full amount of the alleged debt, the law also allows me to make my
good faith offer of performance to depend upon a condition precedent, and if the offer of
performance is not accepted the obligation is extinguished.

This offer is made pursuant to the California Civil Code Section 1485 as follows:

   **1485. OBLIGATION EXTINGUISHED BY OFFER OF PERFORMANCE.**
An obligation is extinguished by an offer of performance, made in conformity to the rules herein
prescribed, and with intent to extinguish the obligation. (Enacted 1872)

And California Code of Civil Procedure, Section 2074, as follows:

---

Page 1

*EX . G*

**2074. OFFER TO PAY OR DELIVER AS EQUIVALENT TO ACTUAL TENDER**. An offer in writing to pay a particular sum of money, or to deliver a written instrument or specific personal property is, if not accepted, equivalent to the actual production and tender of the money, instrument, or property. (Enacted 1872).

Pursuant to California Civil Code, Section 1498, this offer to pay the amount of any money that is lawfully due, up to and including the amount of ONE MILLION ONE HUNDRED EIGHTY THOUSAND DOLLARS ($1,180,000.00) is made to dependent upon performance of a condition precedent to which I am entitled by the fundamental principles of American Jurisprudence and law, namely:

    A. Presentation of evidence sufficient to demonstrate that the obligation for me to pay this amount, if such exits arises by either:

        1. Operation of Law, or;

        2. Contract of the Parties, and;

    B. If the Obligation is created by a promissory note and deed of trust, presentation of the original wet-inked Promissory Note which demonstrates that you are the holder-in-due-course of the original Promissory Note or acting on behalf of someone who has possession of the original wet-inked Promissory Note and Deed of Trust and that you or the Note Holder bring forward the original wet-inked Promissory Note with an endorsement stamp that shows the Promissory Note has been endorsed over to the party claiming to be the Note Holder and beneficiary demonstrating that the original wet-inked Promissory Note is in your or their possession pursuant to California Commercial Code Sections 1201(b)(21)(A), 3309, 3301, 3305, 3203 and 3205 and *Matter of Staff Mortg. & Inv. Co.*, 550 F 2d 1228, (Ninth Circuit, 1977) and that you or the Note Holder and have recorded an assignment of the deed of trust as required under California Civil Code Section 2932.5.

I also require as a condition precedent that you (1) validate the debt; (2) demonstrate that you are requesting payment of debt in legal tender that conforms to the requirements under all provisions of the US Constitution and the California Constitution; (3) that you and the actual Note Holder have the right of subrogation and are not a stranger to the transaction, see *Aetna L. Ins. Co. v Middleport, 124 US 534, (1888)*; and (4) that you and the actual Note Holder are not violating Section 3106 of California Commercial Code, and have sold a promissory note that is non-negotiable, because the promissory note is a conditional promise to pay pursuant to a certain Adjustable Rate Rider.

California Civil Code, Section 1498 states the following:

    **1498. PERFORMANCE OF CONDITION PRECEDENT**. When a debtor is entitled to the performance of a condition precedent to, or concurrent with, performance on his part, he may make his offer to depend upon the due performance of such condition. (Enacted 1872)

It should be noted that California Civil Code Section 1501 provides the authority for me to expect and require that if you have any objection to the mode of this offer, it must immediately state that objection as follows:



**1501. OBJECTIONS TO MODE OF OFFER**. All objections to the mode of an offer of performance, which the creditor has an opportunity to state at the time to the person making the offer, and which could then be obviated by him, are waived by the creditor, if not then stated.

And California Code of Civil Procedure, Section 2076 as follows:

**2076. OBJECTIONS TO TENDER MUST BE SPECIFIED**. The person to whom a tender is made, must, at the time, specify any objection he may have to the money, instrument, or property, or he must be deemed to have waived it: and if the objection be to the amount of money, the terms of the instrument, or the amount or kind of property he must specify the amount, terms or kind which he requires, or be precluded from objecting afterward.

I am in receipt of your correspondence notifying me of your alleged purchase of the promissory note or debt that I signed with WASHINGTON MUTUAL BANK, for my note and deed of trust with that bank/lender. You are also requesting payment of that alleged debt. Perhaps you were unaware that the right of subrogation does not exist for a stranger to the transaction. You have to physically show/produce the original wet-inked Promissory Note as required under a ruling by the Ninth Circuit Court of Appeals (see *Matter of Staff Mortg. & Inv. Co., 550 F 2d 1228)*. If you cannot physically produce or show the original wet-inked Promissory Note, this means that JP MORGAN CHASE BANK, NA as successor to the assets and liabilities of WASHINGTON MUTUAL BANK is not in possession of the original note, and said note has been sold to an undisclosed Third Party note buyer, probably a mortgage backed security.

Is the undisclosed Third Party note buyer a co-signer on the note? I do not think so. I conclude that WASHINGTON MUTUAL BANK's undisclosed Third Party note buyer is a stranger to the transaction. The undisclosed Third Party note buyer is apparently the current holder of the Note and Deed of Trust, even though they do not have the right of subrogation as strangers to the original transaction. Additionally, WASHINGTON MUTUAL BANK's undisclosed Third Party note buyer has never been a co-signer on any debt obligation I have entered into and the undisclosed Third Party note buyer is not secondarily liable to the original creditor, WASHINGTON MUTUAL BANK for the alleged debt. Please review the following for affirmation that the right of subrogation does not exist in this matter: *Henningsen v. United States Fidelity & G. Co.*; *208 US 404; 52 L. Ed 547, 28 S. Ct. 389; Prairie State National Bank v. United States; 164 US 227; 41 L. Ed. 412; 17 S. Ct. 142; Aetna L. Ins. Co. v. Middleport; 124 US 534; 31 L. Ed. 537; 8 S. Ct. 625; McBride v. McBride; 148 Or 478 36 P 2d 175.*

With this QUALIFIED WRITTEN REQUEST/ OFFER OF PERFORMANCE FOR JP MORGAN CHASE BANK, NA, Creditor Claim/Notice of Intent to Enforce Rights under State and Federal Law RICO Title 18 USC Sections 1961, 1962 Et Seq and Sections 891-894 for Extortionate Credit Transactions/ Loan numbers 3062191972 and 419408611094, therefore:

1. Please furnish the original wet-inked Promissory Note, redacting my social security number to prevent identify theft, and state under penalty of perjury that you are the holder in due course of the Promissory Note and will produce the original for my own and a judge's inspection should there be a trial to contest these matters.



2. Please produce the account and general ledger statement showing the complete and full accounting of the alleged obligation that you are now attempting to collect.

3. Please identify by name and address all persons, corporations, associations, or any other parties having an interest in legal proceedings regarding the alleged debt.

4. Please verify under penalty of perjury, that as a debt collector, you have not purchased evidence of debt and are proceeding with collection activity in the name of the original maker of the note.

5. Please verify under penalty of perjury that you know and understand that certain clauses in a contract of adhesion, such as a so-called forum selection clause, are unenforceable unless the party to whom the contract is extended could have rejected the clause without impunity.

6. Please verify under penalty of perjury that you know and understand that the right of subrogation does not exist for a stranger to the transaction.

7. Please provide verification from the stated creditor that you are authorized to act for them.

8. Please verify that you know and understand that contacting me again after receipt of this notice without providing procedurally proper validation of the debt constitutes the use of interstate communications in a scheme of fraud by advancing a writing, which you know is false with the intention that others rely on the written communication to their detriment.

The debtor has a Common law right to demand production or surrender of the bond or note and mortgage, as the case may be. Furthermore a creditor does not have standing in court without an original promissory note in their possession. See *Restatement, Contracts S 170(3), (4) (1932); C.J.S. Mortgages S 469 in Carnegie Bank v Shalleck 256 N.J. Super 23 (App. Div 1992)*, the Appellate Division held: "When the underlying mortgage is evidenced by an instrument meeting the criteria for negotiability set forth in N.J.S. 12A:3-104, the holder of the instrument shall be afforded all the rights and protections provided a holder in due course pursuant to N.J.S. 12A:3-302." Since no one is able to produce the "instrument" there is no competent evidence that any party is the holder of the alleged note or the true holder in due course. New Jersey common law dictates that the plaintiff prove the existence of the alleged note in question, prove that the party sued signed the alleged note, prove that the plaintiff is the owner and holder of the alleged note, and prove that a certain balance is due and owing on any alleged note." Please note that in order to show standing in court a creditor has to bring forward an original promissory note. Federal Circuit Courts have ruled that the only way to prove the perfection of any security is by actual possession of the security. See *Matter of Staff Mortg. & Inv. Corp., 550 F.2d 1228 (9th Cir 1977)*, and under the Uniform Commercial Code, the only notice sufficient to inform all interested parties that a security interest in instruments has been perfected is actual possession by the secured party, his agent or bailee. Bankruptcy Courts have followed the Uniform Commercial Code. In Re Investors & Lenders, Ltd. 165 B.R. 389 (Bkrtcy.D.N.J.1994), under the New Jersey Uniform Commercial Code (NJUCC), promissory note is "instrument," security interest in which must be perfected by possession.

---



To prove damages in foreclosure of a debt, party must enter the account and general ledger statement into the record through a competent fact witness. To prove up claim of damages, the foreclosing party must enter evidence incorporating records such as a general ledger and accounting of an alleged unpaid promissory note; the person responsible for preparing and maintaining the account general ledger must provide a complete accounting which must be sworn to and dated by the person who maintained the ledger. See *Pacific Concrete F.C.U. V. Kauanoe*, 62 Haw. 334, 614 P.2d 936 (1980); *GE Capital Hawaii, Inc. v. Yonenaka*, 25 P.3d 807, 96 Hawaii 32, (Hawaii App 2001); *Fooks v. Norwich Housing Authority*, 28 Conn. L. Rptr. 371, (Conn. Super.2000); *and Town of Brookfield v. Candlewood Shores Estates, Inc.*, 513 A.2d 1218, 201 Conn.1 (1986). See also *Solon v. Godbole*, 163 Ill. App. 3d 845, 114 Il.

**Banks have no right to lend credit as this is a violation of their corporate charter and violates Federal law, and is prohibited under the doctrine of ultra vires.**

The United States Supreme Court and the lower courts have long recognized that the banks cannot loan credit.

"In the federal courts, it is well established that a national bank has not power to lend its credit to another by becoming surety, indorser, or guarantor for him." *Farmers and Miners Bank v. Bluefield Nat 'l Bank, 11 F 2d 83, 271 U.S. 669.* "A national bank has no power to lend its credit to any person or corporation." . . . *Bowen v. Needles Nat. Bank*, 94 F 925 36 CCA 553, certiorari denied in 20 S.Ct 1024, 176 US 682, 44 LED 637.

"The doctrine of ultra vires is a most powerful weapon to keep private corporations 002R00051277 within their legitimate spheres and to punish them for violations of their corporate charters, and it probably is not invoked too often..." *Zinc Carbonate Co. v. First National Bank*, 103 Wis 125, 79 NW 229. *American Express Co. v. Citizens State Bank*, 194 NW 430.

"A bank may not lend its credit to another even though such a transaction turns out to have been of benefit to the bank, **and in support of this a list of cases might be cited, which-would look like a catalog of ships.**" [Emphasis added] *Norton Grocery Co. v. Peoples Nat. Bank*, 144 SE 505. 151 Va 195.

"It has been settled beyond controversy that a national bank, under federal law being limited in its powers and capacity, cannot lend its credit by guaranteeing the debts of another. All such contracts entered into by its officers are ultra vires ..." *Howard & Foster Co. v. Citizens Nat'l Bank of Union*, 133 SC 202, 130 SE 759(1926).

"Neither, as included in its powers not incidental to them, is it a part of a bank's business to lend its credit. If a bank could lend its credit as well as its money, it might, if it received compensation and was careful to put its name only to solid paper, make a great deal more than any lawful interest on its money would amount to. If not careful, the power would be the mother of panics, . . . Indeed, lending credit is the exact opposite of lending money, which is the real business of a bank, for while the latter creates a liability in favor of the bank, the former gives rise to a liability of the bank to another. *I Morse. Banks and Banking 5th Ed. Sec 65; Magee, Banks and Banking, 3rd Ed. Sec 248.*" *American Express Co. v. Citizens State Bank*, 194 NW 429.



"It is not within those statutory powers for a national bank, even though solvent, to lend its credit to another in any of the various ways in which that might be done." *Federal Intermediate Credit Bank v. L'Herrison*, 33 F 2d 841, 842 (1929).

"There is no doubt but what the law is that a national bank cannot lend its credit or become an accommodation endorser." *National Bank of Commerce v. Atkinson*, 55 E 471.

"A bank can lend its money, but not its credit." *First Nat'l Bank of Tallapoosa v. Monroe*. 135 Ga 614, 69 SE 1124, 32 LRA (NS) 550. "... the bank is allowed to hold money upon personal security; but it must be money that it loans, not its credit." *Seligman v. Charlottesville Nat. Bank*, 3 Hughes 647, Fed Case No.12, 642, 1039.

"A loan may be defined as the delivery by one party to, and the receipt by another party of, a sum of money upon an agreement, express or implied, to repay the sum with or without interest." *Parsons v. Fox;* 179 Ga 605, 176 SE 644. Also see *Kirkland v. Bailey*, 155 SE 2d 701 and *United States v. Neifert White Co*., 247 Fed Supp 878, 879.

I will pay the entire amount of money that you say is due to you in full if you can: (1) validate the debt; (2) demonstrate that you are requesting payment of debt in legal tender that conforms to the requirements under all provisions of the US Constitution; and (3) meet all of the requirements set forth in my offer of performance above.

Your failure to satisfy this request in accordance with the requirements of the Fair Debt Collection Practices Act will be construed to be an absolute waiver of any and all claims against me, and your tacit agreement to compensate me for costs and attorney fees. Please complete the "Creditor Form" attached.

Signature _____
                     Lawrence Munar Asuncion

Copy to:
Consumer Response Center
Federal Trade Commission
Washington, D.C. 20580

EX. G

# CREDITOR FORM

Name and Address of Collector (assignee)
JP MORGAN CHASE BANK, NA
LOSS MITIGATION DEPARTMENT
270 PARK AVENUE
New York, New York 10017-2014

Lawrence Munar Asuncion
1156 Barcelona Drive
Pacifica, California 94044

Account Number(s)/Loan(s): 3062191972 and 419408611094

1. What are the terms of assignment for this account? You may attach a facsimile of any records relating to such terms.

2. Have any insurance claims been made by any creditor or assignee regarding this account?

3. What happened to the consideration I deposited with the bank for the extension of the credit?

4. Has the purported balance of this account been used in any tax deduction claim?

5. Please list the particular products or services sold by the collector to the debtor and dollar amount of each.

6. Upon failure or refusal of collector to validate this collection action, collector agrees to waive all claims against the debtor named herein and pay debtor for all costs and attorney fees involved in defending this collection action.


Authorized signature of collector:_____Date:_____

Please return this completed form and <u>attach all assignment or other transfer agreements that would establish you right to collect this debt.</u> Your claim cannot be considered if any portion of this form is not completed and returned with the required documents. This is a request for validation of the debt made pursuant to the Fair Debt Collection Practices Act. If you do not respond as required by law, your claim will not be considered and you may be liable for damages for continued collection efforts. Please allow thirty (30) days for processing after your request.



## - CERTIFICATE OF SERVICE -

I, Romboad Alborzi, do hereby certify that I did deposit in U.S. Post certified mail, return receipt First Class and in adequate packaging one copy of the attached documents (Lawrence Asuncion QWR) to (and JP Morgan Chase Bank, NA; Chase Home Finance, LLC; CHASE; and California Reconveyance, LLC) addressed to the following parties: Loss Mitigation Dept. for Chase Home Finance, LLC; JP Morgan Chase Bank, NA (Corporate Office); Chase Bank NA;, Chase Bank Fulfillment Center and Chase Trustee: California Reconveyance, LLC at the addresses listed below. I am a Citizen of the United States, I am over 18 years of age, and I am not party to this action.

9-24-10
Date

Signature

**USPS CERTIFIED "QWR" LETTERS & RETURN RECEIPT SENT TO JPMORGAN CHASE:**

**CHASE HOME FINANCE LLC; CHASE; and CALIFORNIA RECONVEYANCE COMPANY**

**Re Loan Numbers: 3062191972 & 00419408611094:**

| | |
|---|---|
| **JP Morgan Chase Bank, N.A.**<br>(and Chase Home Finance)<br>270 Park Avenue<br>New York, NY 10017 | **Chase Home Finance**<br>Attention: Customer Service<br>PO Box 24696<br>Columbus, OH 43224-0696 |
| **Chase Fulfillment Center**<br>4500 Cherry Creek South Drive, Suite 410<br>Glendale, CO 80246-1518 | **JP Morgan Chase Bank N A**<br>1111 Polaris Parkway<br>Columbus, OH 43240 |
| **JPMorgan Chase Bank, N.A.**<br>7301 Baymeadows Way,<br>Jacksonville, FL 32256 | **Chase Home Finance**<br>PO Box 44118<br>Jacksonville, FL 32231-4118 |
| **Chase Home Finance LLC**<br>Attention: Collections Department<br>3415 Vision Drive<br>Mail Code OH4-7144<br>Columbus, OH 43219-6009 | **JPMorgan Chase**<br>Attention: Loss Mitigation Department<br>9200 Oakdale Avenue, 9th Floor<br>Chatsworth, CA 91311 |
| **Chase**<br>PO Box 78036<br>Phoenix, AZ 85062-8036 | **Chase**<br>P.O. Box 24714<br>Columbus, OH 43224 |



## - CERTIFICATE OF SERVICE -

| | |
|---|---|
| **Chase Home Finance LLC**<br>7255 Baymeadows Way<br>Jacksonville, FL 32256 | **CALIFORNIA Reconveyance Company**<br>9200 Oakdale Avenue<br>Mail Stop N110612<br>Chatsworth, CA 91311 |
| **Chase Home Finance LLC**<br>FL5-7730<br>P.O. Box 44090<br>Jacksonville, FL 32231-4090 | |

EX G

**Lawrence M. Asuncion**
**1156 Barcelona Drive,**
**Pacifica, California 94044**

DATE: September 21, 2010

**JP Morgan Chase Bank, N.A.**
**270 PARK AVENUE**
**New York, New York 10017**

Loan #(s):   **3062191972 (1st Loan) & 419408611094 (2nd Loan)**
                        **- Referred herein as "Loan"**
Borrower(s) Name: **Lawrence M. Asuncion & Maria Estrella C. Asuncion**
Property Address:   **1156 Barcelona Drive, Pacifica, California 94044**

**RE:   RESPA QUALIFIED WRITTEN REQUEST, COMPLAINT, DISPUTE**
         **OF DEBT & VALIDATION OF DEBT LETTER**

Dear Madam or Sir:

I am writing to you to complain about the accounting and servicing of my mortgage (referenced 1st Loan & 2nd Loan numbers above) and my need for understanding and clarification of various charges, credits, debits, transactions, actions, payments, analyses, and records related to the servicing of my loan from its inception to the present date.  As such, please treat this letter as a **"Qualified Written Request"** under the Real Estate Settlement Procedures Act (RESPA), codified as Section 2605 (e) of Title 12 of the United States Code.  As you may know, RESPA provides substantial penalties and fines for non-compliance or answers to my questions provided in this letter within sixty [60] days!

Due to the recent mortgage market meltdown and your involvement in this market, I am concerned that my loan has not been properly credited, amortized, calculated, and serviced properly.  I am also concerned with the ownership of my promissory note; to whom my actual obligation is owed to; who is my actual lender; and your authority to collect payments and/or negotiate the purchase/repurchase of my promissory note from my actual lender.

The meltdown of the mortgage market and the effects of any financial manipulation may have affected the current amount you claim I owe as the principal balance due on my loan which may not be correct and may not have been properly amortized.  In addition, I am concerned that my escrow payments and/or my monthly payments may have been adversely affected and that I may be paying more than what I owe or less than is necessary to properly amortize my mortgage over its term.

Upon receipt of this letter, please refrain from reporting any negative credit information to any credit reporting agencies until you respond to the "requests" in this letter.

---

Qualified Written Request                                                          Page 1



Due to the current economic climate, I am exploring various options to protect my property and finances. My home is a very important and valuable asset to me that I desire to protect. Please don't infer any negative connotation by my letter, but the industry-wide practices employed in recent years trouble me and I am seeking information to not only alleviate my concerns, but to guard against future problems.

I am examining my finances and making determinations as to how best to payoff, reduce, and/or refinance my mortgage and/or sell my property to one interest or another. I executed a promissory note that is a contract between myself and the original lender. The United States government may actually own my promissory note. If so I or investors I know, may desire to purchase back my promissory note from the government or my actual current lender, at a profit, as part of a purchase of my property and/or restructuring of my finances.

I have contracted with a firm to audit my mortgage loan that you service as well as explore various purchase, sale, refinancing, loan, business, and financial options for me. In order to conduct this examination and audit, I need to have full and immediate disclosure including copies of all pertinent information related to my loan. As such, please send to me, at the address above, copies of the following documents and answers to my servicing related questions below within the 60-day time frame.

I need to know the information requested herein because of the fact that frequently two or more "lenders" request payment on the same loan and because of the fact that most notes are sold to a mortgage backed security and securitized and the actual note holder is not the "creditor" attempting to foreclose on the mortgage/deed of trust/ note and the identity of the actual note holder cannot be determined, so that the party foreclosing frequently does not have possession of loan origination documents and does not have standing to foreclose under FRCP Rule 17(a). I am relying upon UCC 1-201(b)(21)(A), 3-301, 3-305, 3-309, 9-304, 9-305 3-203, and 3-205 in part for my authority to require this information. See also *Matter of Staff Mortg. & Inv. Co., 550 F 2d 1227, (CA 9, 1977)* and six subsequent cases handed down by the Ninth Circuit as well as similar cases issued by the Fifth, Sixth and Eighth Circuit Courts for authority to require this information. In Massachusetts one law firm was fined $ 100,000.00 by the bankruptcy judge for concealing the fact that their client was not even a loan servicer at the time that they filed a claim in a bankruptcy case.

I hereby demand absolute first hand evidence from you of the original uncertificated or certificated security regarding account numbers: 3062191972 and 419408611094. In the event you do not supply me with the very security it will be a positive confirmation on your part that you do not have the requisite documentation, needless to say the possession, of a note. As you know possession of the original note is the most important document here.

I also hereby demand that a chain of transfer from you to wherever the security is now be promptly sent to us as well. Absent the actual evidence of the security I have no choice but to dispute the validity of your lawful ownership, funding, entitlement right, and the current debt you say we owe. By debt I am referring to the principal balance you claim we owe on account numbers 3062191972 and 419408611094; the calculated monthly payment, calculated escrow payment and any fees claimed to be owed by you or any trust or entity you may service or sub-service for.

---

Qualified Written Request                                                                 Page 2



This can be done independently and to validate this debt, I need to have a complete exam, audit, review and accounting of this mortgage account from its inception through the present date. I also request that you conduct your own investigation and audit of this account since its inception to validate the debt you currently claim we owe. I would like you to validate the debt you currently claim we owe. I would like you to validate the debt so that it is accurate to the penny!

Please do not rely on previous servicing companies or originators records, assurances or indemnity agreements and refuse to conduct a full audit and investigation of this account. I understand that potential abuses by you or previous servicing companies could have deceptively, wrongfully, unlawfully, and/or illegally:

- Increased the amounts of monthly payments;
- Increased the principal balance we owe;
- Increased the escrow payments;
- Increased the amounts applied; and attributed toward interest on this account;
- Decreased the proper amounts applied and attributed toward the principal on this account and/or
- Assessed, charged and/or collected fees, expenses and miscellaneous charges I am not legally obligated to pay under this mortgage, note and/or deed of trust.

I request that you insure that we have not been the victim of such predatory servicing and lending practices. To insure this, I have authorized a thorough review, audit, examination, accounting of the above mortgage account numbers 3062191972 and 419408611094 from the date of initial contact, application and the origination of this account to the present date written above.

**Again, this is a Qualified Written Request under the Real Estate Settlement Procedures Act, codified as Title 12 section 2605(e) of the United States Code as well as a request under the Truth In Lending Act 15 U.S.C. section 1601. RESPA provides substantial penalties and fines for non-compliance or failure to answer my questions provided in this letter within sixty (60) days of its receipt.**

In order to conduct the examination and audit of this loan, I need to have a full and immediate disclosure including copies of all pertinent information and complete documents regarding this loan. The documents requested and answers to my questions are needed by myself and others to ensure this loan:

1. Was originated in lawful compliance with all federal and state laws, regulations including, but not limited to Title 62 of the Revised Statutes, RESPA, TILA, Fair Debt Collection Practices Act, HOEPA and other laws;

2. That the origination and/or any sale or transfer of this account or monetary instrument, was conducted in accordance with proper laws and was a lawful sale with complete disclosure to all parties with an interest;

3. That you disclose the claimed holder in due course of the monetary instrument/deed of trust/asset is holding such note in compliance with statutes, State and Federal laws and is entitled to the benefits of payments;

4. That all good faith and reasonable disclosures of transfers, sales, Power of Attorney, monetary instrument ownership, entitlements, full disclosure of actual funding source, terms, costs, commissions, rebates, kickbacks, fees, etc. were and still are properly disclosed to me, including, but not limited to the period commencing with the original loan solicitation, through and including all parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof.

5. That each servicers and/or sub-servicers of this mortgage has serviced this mortgage in accordance with statute, laws and the terms of mortgage, monetary instrument/deed of trust, including but not limited to all accounting or bookkeeping entries commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof;

6. That each servicers and/or sub-servicers of this mortgage has serviced this mortgage in compliance with local, state and federal statutes, laws and regulations commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof;

7. That this mortgage account has been credited, debited, adjusted, amortized and charged correctly and disclosed fully commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof;

8. That interest and principal have been properly calculated and applied to this loan;

9. That any principal balance has been properly calculated, amortized and accounted for;

10. That no charges, fees or expenses, not obligated by me in any agreement, have been charged, assessed or collected from this account or any other related account arising out of the subject loan transaction.

As such, please send to me, at the address above, the documents requested below as soon as possible. Please also provide copies, front and back, of the following documents:

### DOCUMENTS NEEDED TO CONDUCT AUDIT

1. All "master" transaction registers/ledgers of my loan in your servicing files or backup files with you or any sub-servicer, including but not limited to the Fidelity mortgage servicing system, *FiServ* or any mortgage servicing system you use.  Please provide all information residing in any data field in the system or any component that supports the system that deals with any of the questions listed below. (no screen or partial dumps or spreadsheets please).

2. Also, please provide and include all descriptions and legends of all Codes used in your mortgage servicing and accounting system so that the examiners, auditors and experts I have retained to audit and review my mortgage account may properly conduct their work.

---



3. A certified copy of the front and back portion of my original wet ink promissory note as it exists today along with all endorsements, affixed or un-affixed allonges, and assignments whether recorded or not.

4. A certified copy of the front and back portion of my original wet ink deed of trust as it exists today along with all assignments whether recorded or not.

5. Front and back all cancelled checks, wire transmittals or other evidence of payment for each assignment of my promissory note.

6. All executed, recordable and "non-recordable" assignments associated with my loan including, but not limited to assignments, transfers, allonges, or other documents evidencing a transfer, sale or assignment of my mortgage, deed of trust, promissory note or other document that secures payment by me to my obligation in this account from the inception of my loan to the present date.

7. All records, electronic or otherwise, of assignments of my mortgage, promissory note, or servicing rights to my mortgage.

8. All escrow analyses conducted on my account from the inception of my loan until the date of this letter.

## SERVICING RELATED QUESTIONS I NEED ANSWERED

After the recent problems in the mortgage market, I have many servicing related questions in addition to the questions enumerated above. I worry that I do not have good and proper title to my property and that the amounts you claimed owed by me are incorrect. Please answer the following questions for me.

1. What is your actual servicing relationship with my loan? Are you the servicer, master servicer, interim servicer, private label servicer, default servicer, sub-servicer, and/or special servicer of my loan?

2. Has my promissory note ever been securitized? If so kindly inform me of the following information:

    a. All trusts, SPVs, QSPEs, REMICS, and entities that my note has been assigned to from its inception to the current date?
    b. The current trust, SPV, QSPE, SPE, REMIC or entity my note is owned by?

3. Is there any Fannie Mae, Freddie Mac, Ginnie Mae, FHA, HUD, VA, or private guarantee related to my loan?

    a. If yes, who has provided this guarantee and what portion of my payment goes to this guarantee?

---



4. Who is the document custodian that safeguards and holds my "original" promissory note that I/we signed in wet ink?

5. Does my original promissory note currently have any "blank endorsements" on it?  (Yes/No)

   a. If yes, can you kindly explain why?
   b. If yes, can you kindly tell me as of the date written above:
      i. Who owns my note and is the actual current "lender" and not servicer of my note?
      ii. Who claims to be the holder of my note?
      iii. Has the United States government or the Federal Reserve purchased the note?

6. Does my original promissory note properly reflect the chain of title from one interest to another?  (Yes/No)

7. Are there any missing assignments?  (Yes/No)

   a. If yes, can you kindly explain why?

8. Has any due diligence and/or quality control services conducted by you or any other entity on my loan identified any red flags, frauds, misrepresentations, misstatements, errors, or problems?

   a. If yes, can you kindly detail for me?

9. Has my loan ever been classified as a "scratch and dent" loan?

   a. If yes, can you kindly detail for me why?

10. Will I receive my original (signed in ink) promissory note stamped "Cancelled & Paid In Full" when it is paid off or refinanced?

    a. If no, can you tell me why not?

11. Have any BPOs, property inspections, and/or appraisals by you or any investor been conducted on my property since the inception of my loan?  (Yes/No)

    a. If yes, have I been charged or assessed any fee for any BPOs, property inspections or appraisals after the inception of my loan?  (Yes/No)

       i. If yes, kindly tell me the date of such BPO, property inspections or appraisal, the amount paid and provide me with copies of all documents related to each BPO, property inspections or appraisal conducted on my property including, but not limited to reports, orders, invoices and cancelled checks for payments.

12. Who may I contact to negotiate the purchase and/or repurchase of my promissory note?

---

Qualified Written Request                                    Page 6



4. Are late fees considered interest?  Yes or No?

5. Please detail for me in writing what expenses and damages you incurred for any payment I made that was late.

6. Were any of these expenses or damages charged or assessed to my account in any other way? Yes or No?

7. If yes, please describe what expenses or charges were charged or assessed to my account?

8. Please describe for me in writing what expenses you or others undertook due to any payment I made that was late?

9. Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed authorized the assessment or collection of late fees?

**Please also send me copies, front and back, of:**

1. Any documentation evidencing any trust relationship regarding the Mortgage/Deed of Trust and any Note in this matter;

2. Any and all document(s) establishing any Trustee of record for the Mortgage/Deed of Trust and any Note;

3. Any and all document(s) establishing the date of any appointment of Trustee Mortgage/Deed of Trust and any Note, including any and all assignments or transfers or nominees of any substitute trustees(s);

4. Any and all document(s) establishing any Grantor for this Mortgage/Deed of Trust and any Note;

5. Any and all document(s) establishing any Grantee for this Mortgage/Deed of Trust and any Note;

6. Any and all document(s) establishing any Beneficiary for this Mortgage/Deed of Trust and any Note;

7. Any documentation evidencing the Mortgage/Deed of Trust is not a constructive trust or any other form of trust;

8. All data, information, notations, text, figures and information contained in your mortgage servicing and accounting computer systems including, but not limited to Alltel or Fidelity CPI system, or any other similar mortgage servicing software used by you, any servicers, or sub-servicers of this mortgage account from the inception of this account to the date written above.

---

Qualified Written Request                                      Page 8

13. What is the name and date of the pooling and servicing agreement that governs your servicing of my loan?

    a.  Where can I secure a copy of this agreement?

14. Is there any power of attorney ("POA") filed in my property's county or any other county that governs your relationship with my loan?

    a.  If yes, kindly identify for me the country where the POA is filed and the filing number, name, and date of the POA?

## SUSPENSE/UNAPPLIED ACCOUNT QUESTIONS

For purposes of this section, please treat the term "suspense account" and "unapplied account" as one in the same.

1. Has there been any suspense or unapplied account transactions on my account from the inception of my loan until present date?

    a.  If yes, why?  If no, please skip the questions in this section dealing with suspense and unapplied accounts.
    b.  In a spreadsheet or in letter form in a columnar format, please detail for me each and every suspense or unapplied transaction, both debits and credits that has occurred on my account from the inception of my loan until present date?
    c.  What is my current suspense account balance?
    d.  Why was my money placed into suspense and how will it be allocated to my loan?

## LATE FEE QUESTIONS

For purposes of my questions below dealing with late fees, please consider the terms "late fees" and "late charges" to be one in the same.

1. Has there been any late fee transaction/s on my account from the inception of my loan until the present date?

    a.  If yes, why?  If no, please skip the questions in this section dealing with late fees.
    b.  In a spreadsheet or in letterform in a columnar format, please detail for me each and every late fee transaction, both debits and credits that has occurred on my account from the inception of my loan until present date?
    c.  What is my current late fee balance?

2. Have you reported the collection of late fees on my account as interest in any statement to me or to the IRS?  Yes or No?

3. Do you consider the payment of late fees as liquidated damages to you for not receiving my payment on time?  Yes or No?

Ex. 6

9. All descriptions and legends of all Codes used in your mortgage servicing and accounting system so the examiners and auditors and experts retained to audit and review this mortgage account may properly conduct their work.

10. All assignments, transfers, allonge, or other documents evidencing a transfer, sale or assignment of this mortgage, deed of trust, monetary instrument or other document that secures payment by me to this obligation in this account from the inception of this account to the present date including any such assignment on MERS.

11. All records, electronic or otherwise, of assignments of this mortgage, monetary instrument or servicing rights to this mortgage including any such assignments on MERS.

12. All deeds in lieu, modifications to this mortgage, monetary instrument or deed of trust from the inception of this account to the present date.

13. Each and every canceled check, money order, draft, debit or credit notice issued to any servicers of this account for payment of any monthly payment, other payment, escrow charge, fee or expense on this account.

14. All escrow analyses conducted on this account from the inception of this account until the date of this letter.

15. Each and every canceled check, draft or debit notice issued for payment of closing costs, fees and expenses listed on any and all disclosure statements including, but not limited to, appraisal fees, inspection fees, title searches, title insurance fees, credit life insurance premiums, hazard insurance premiums, commissions, attorney fees, points, etc.

16. Each and all payment receipts, checks, money orders, drafts, automatic debits and written evidence of payments made by others or me on this account.

17. All letters, statements and documents sent to me by your company.

18. All letters, statements and documents sent to me by agents, attorneys or representatives of your company.

19. All letters, statements and documents sent to me by previous servicers, sub-servicers or others in your account file or in your control or possession or in the control or possession of any affiliate, parent company, agent, sub-servicers, servicers, attorney or other representative of your company.

20. All letters, statements and documents contained in this account file or imaged by you, any servicers or sub-servicers of this mortgage from the inception of this account to the present date.

21. All electronic transfers, assignments and sales of the note/asset, mortgage, deed of trust or other security instrument.

---

Qualified Written Request                                           Page 9



22. All copies of property inspection reports, appraisals, BPOs and reports done on my property.

23. All invoices for each charge such as inspection fees, BPOs, appraisal fees, attorney fees, insurance, taxes, assessments or any expense which has been charged to this mortgage account from the inception of this account to the present date.

24. All checks used to pay invoices for each charge such as inspection fees, BPOs, appraisal fees, attorney fees, insurance, taxes, assessments or any expense which has been charged to this account from the inception of this account to the present date.

25. All agreements, contracts and understandings with vendors that have been paid for any charge on this account from the inception of this account to the present date.

26. All account servicing records, payment payoffs, payoff calculations, ARM audits, interest rate adjustments, payment records, transaction histories, account histories, accounting records, ledgers, and documents that relate to the accounting of this account from the inception of this account to the present date.

27. All account servicing transaction records, ledgers, registers and similar items detailing how this account has been serviced from the inception of this account to the present date.

Further, in order to conduct the complete audit and review of this account, and to determine all proper amounts due, I need the following answers to questions concerning the servicing and accounting of this mortgage account from its inception to the present date. Accordingly, please provide me, in writing, the answers to the following questions:

### In regards to Mortgage and Assignments:

1. Has each sale, transfer or assignment of this mortgage, monetary instrument, deed of trust or any other instrument I executed to secure this debt been recorded in the county property records in the county and state in which my property is located from the inception of this account to the present date? Yes or No?

2. If not, why?

3. Is your company the servicer of this mortgage account or the holder in due course and beneficial owner of this mortgage, monetary instrument and/or deed of trust?

4. Have any sales, transfers or assignments of this mortgage, monetary instrument, deed of trust or any other instrument I executed to secure this debt been recorded in any electronic fashion such as MERS or other internal or external recording system from the inception of this account to the present date? Yes or No?

5. If yes, please detail for me the names of the seller, purchaser, assignor, assignee or any holder in due course to any right or obligation of any note, mortgage, deed of trust or security instrument I executed securing the obligation on this account that was not recorded in the

---

Ex. 6

county records where my property is located whether they be mortgage servicing rights or the beneficial interest in the principal and interest payments.

Thank you in advance for addressing the questions and issues above. As mentioned, upon receipt of the documents and answers, an exam and audit will be conducted that may lead to a further document requests and answers to questions under an additional Qualified Written Request (QWR) letter.

It is my hope that my immediate questions and audit will validate my debt to the penny. If not, we will need to correct and adjust any errors or abuses identified. I also want to negotiate a purchase price for my note from my actual lender.

I anxiously await your prompt response to this request.

Sincerely,

**Lawrence M. Asuncion**
Certified Return Receipt Mail

EX G

## - CERTIFICATE OF SERVICE -

I, Romboad Alborzi, do hereby certify that I did deposit in U.S. Post certified mail, return receipt First Class and in adequate packaging one copy of the attached documents (Lawrence Asuncion QWR) to (and JP Morgan Chase Bank, NA; Chase Home Finance, LLC; CHASE; and California Reconveyance, LLC) addressed to the following parties: Loss Mitigation Dept. for Chase Home Finance, LLC; JP Morgan Chase Bank, NA (Corporate Office); Chase Bank NA;, Chase Bank Fulfillment Center and Chase Trustee: California Reconveyance, LLC at the addresses listed below. I am a Citizen of the United States, I am over 18 years of age, and I am not party to this action.

_G-22-10_
Date

_Signature_

**USPS CERTIFIED "QWR" LETTERS & RETURN RECEIPT SENT TO JPMORGAN CHASE;**

**CHASE HOME FINANCE LLC; CHASE; and CALIFORNIA RECONVEYANCE COMPANY**

Re Loan Numbers: 3062191972 & 00419408611094:

| | |
|---|---|
| **JP Morgan Chase Bank, N.A.**<br>(and Chase Home Finance)<br>270 Park Avenue<br>New York, NY 10017 | **Chase Home Finance**<br>Attention: Customer Service<br>PO Box 24696<br>Columbus, OH 43224-0696 |
| **Chase Fulfillment Center**<br>4500 Cherry Creek South Drive, Suite 410<br>Glendale, CO 80246-1518 | **JP Morgan Chase Bank N A**<br>1111 Polaris Parkway<br>Columbus, OH 43240 |
| **JPMorgan Chase Bank, N.A.**<br>7301 Baymeadows Way,<br>Jacksonville, FL 32256 | **Chase Home Finance**<br>PO Box 44118<br>Jacksonville, FL 32231-4118 |
| **Chase Home Finance LLC**<br>Attention: Collections Department<br>3415 Vision Drive<br>Mail Code OH4-7144<br>Columbus, OH 43219-6009 | **JPMorgan Chase**<br>Attention: Loss Mitigation Department<br>9200 Oakdale Avenue, 9th Floor<br>Chatsworth, CA 91311 |
| **Chase**<br>PO Box 78036<br>Phoenix, AZ 85062-8036 | **Chase**<br>P.O. Box 24714<br>Columbus, OH 43224 |



## - CERTIFICATE OF SERVICE -

| | |
|---|---|
| **Chase Home Finance LLC**<br>7255 Baymeadows Way<br>Jacksonville, FL 32256 | **CALIFORNIA Reconveyance Company**<br>9200 Oakdale Avenue<br>Mail Stop N110612<br>Chatsworth, CA 91311 |
| **Chase Home Finance LLC**<br>FL5-7730<br>P.O. Box 44090<br>Jacksonville, FL 32231-4090 | |

Ex. G

# EXHIBIT H
## Common law liens

*Ex. H*

Recording requested by:
Lawrence Munar Asuncion
When recorded mail to:
Lawrence Munar Asuncion
1156 Barcelona Drive
Pacifica, California
[NEAR  94044]
united States of America
(APN: 023-501-390)

## <u>GRANT DEED</u>

Tender Regarding the Lands made this <u>27th</u> day of <u>September</u> in the year of our Lord two thousand and ten.

Grantee of

LAWRENCE MUNAR ASUNCION and
MARIA ESTRELLA C. ASUNCION
1156 Barcelona Drive
Pacifica, California
united States of America

Who does hereby accept, as a tender of amends from;

Grantor

Lawrence Munar Asuncion and
Maria Estrella C. Asuncion
In-Care-Of
1156 Barcelona Drive
Pacifica, California-state
united States of America

There is no consideration of $1.00 lawful money of the United States of America needed for the purposes of this instrument, to be paid to the Grantors in hand, nor need any such tender be made by the Grantees, at or before the sealing and delivery of these presents, the receipt whereof is not acknowledged, and the Grantors need not be fully satisfied, but by these presents can tender of amends, by settlement or conveyance unto Grantees forever. All the property, including land and buildings, situated in Pacifica, San Mateo-county, California, located in the united States of America bounded and described as follows:

That parcel of land situated in Pacifica, San Mateo County, California commonly known as 1156 Barcelona Drive, Pacifica and more particularly described as:

PORTION of Lot 5, as delineated upon that certain Map entitled, "Resubdivision of Linda Mar Estates, Resubdivides Lots 16, 17, 18, 19, 21, 22, and 23, Pacifica, San Mateo County, California", filed in the Office of the Recorder of the County of San Mateo, State of California, on February 4th, 1965, in Book 61 of Maps, at Page 36, more particularly described as follows:

- page one of three -

*Ex.H.*

Beginning at the Point of Intersection of the Easterly line of said Lot 5, with the Southeasterly line of Barcelona Drive; thence from said point of beginning along said Easterly line South 14 ° 47″ 21″ West, 91.05 feet; thence leaving said Easterly line of Lot 5, South 7° 55″09″ West, 46.49 feet; thence South 29° 08″28″West, 117.11 feet to the Most Southerly corner of said Lot 5; thence along the line common to said Lot 5 and Lot 6, as shown on the above mentioned Map, North 48° 34″39″ West, 10.71 feet and North 80° 06″58″ West, 30.03 feet to the Westerly line of said Lot 5; thence along the generally Westerly line of said Lot 5, North 9° 53″ 02″ East, 66.25 feet and North 29° 45″32″ West, 66.35 feet to the Southeasterly line of Barcelona Drive; thence along the last mentioned line, Northeasterly on the arc of a curve to the left, from tangent which bears North 60° 14 ″28″ East; said curve having a radius 170.00 feet, a central angle of 5° 14″28″, an arc distance of 15.55 feet and North 55° 00″ East, tangent to the preceding curve, 160.02 feet to the point of beginning.

The aforesaid offer regarding a tender of amends is made to secure The Grantee's common law lien and give NOTICE to the world, the object of which action is to enable the Grantee to secure money damages and exercise Civil, political, natural and Constitutionally secured rights. The particular property described will be subject to prosecution to satisfy judgments in this action. The failure, refusal or neglect of the Respondent to demand the Sheriff to convene said Common Law Court within ninety (90) days from the date of filing this instrument will be deemed to be "prima -Facie" evidence of an admission of waiver of all their rights to the property described herein. DEMAND is made upon all public officials under penalty not to modify or remove this lien in any manner. This lien is made to secure rights pursuant to the First, Fourth, Ninth and Tenth Articles of Amendment, (Bill of Rights) to the Constitution for the united States of America and the same provisions in the US Constitution and secure rights secured under Article Four, Section Four of the Constitution for the united States of America and the same provision in the US Constitution.

Common law liens in law supersede mortgages and equity liens, Drummond Carriage Co. v. Mills; 74 NW 966 (1898); Hewitt v. William; 47 La. Ann. 742; 17 So. 269; Carr v. Dail; 19 SE 235; MacMahon v. Lundin; 58 NW, 827; and may be satisfied only when a Court of Common Law is convened pursuant to order of the elected Sheriff under Article Seven of the Bill of Rights and the Northwest Ordinance of 1787.

Such Common Law Court forbids the presence of any Judge or Lawyer from participating   or presiding or the practice of any equity law. The ruling of the United States Supreme   Court in Rich v. Braxton; 158 US 375 specifically forbids judges from invoking equity   jurisdiction to remove common law liens or similar "clouds on title". Further even if the   preponderance of evidence demonstrates the lien to be void or voidable, the equity court   still may not proceed until the moving party asks for and comes "to equity" with "clean   hands". Trice v. Constock; 121 Fed. 620; West v.Washburn; 138 NY Supp. Any official who attempts to modify or remove this common law lien is fully liable for damages, Butz v  Economou; 438 US 478; 98 S. Ct. 2894; Bell v. Hood; 327 US 678; Belknap v.Schild; 161 US 10; US v Lee 106 US 196; Bivens v. 6 Unknown Agents 400 US 862.

This lien is not dischargeable for 100 years and cannot be extinguished as a result of my death, or by our heirs assigns or executors. Now therefore, if said lien is well and truly paid according to it's tenor to the lienor or rescinded by the lienor herein named, then this Title shall be void otherwise, all right, title, interest, use and full control of the herein described property will remain in full force and effect to the lienor herein named or his or her heirs and or assigns.

Ex.H

Together with all and singular the buildings, improvements, ways, woods, waters, watercourses, all claims to mineral rights, rights, liberties, hereditaments, and appurtenances, to the same belonging or in anywise appertaining; and the reversion and reversions, remainder and remainders, rents, issues and profits thereof any and every part and parcel thereof; and All the estate, allodial title, rights, title, interest, use, property right, claim and demand whatsoever, of the Grantors, in and to the premises herein described, and every part and parcel thereof, with the appurtenances. To have and to hold all and singular, the premises herein described, together with the appertenances, unto the Grantees, and the Grantee's proper use and benefit forever under the protection of the "Law of the Land". To wit; for Lawrence Munar Asuncion and Maria Estrella C. Asuncion in the amount of $1,180,000.00 in present circulating currency or $118,000.00 in gold and silver coin.

In all references herein to any parties, persons entities or corporations, the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require.

Whenever in this instrument any party shall be designated or referred to by name or general reference, such designation is intended to and shall have the same effect as if the words "heirs, executors, personal or legal representatives, successors and assigns" had been appended after each and every such designation. The recording of this deed in no way grants attorney in holding, attorney in fact or attorney in due course to anyone holding an original or certified copy. Claimant is Holder in due course of original, convention de la Haye du 5 Octobre1961.

Authorities:

It has been held to be wholly immaterial how imperfect or defective the writing may be, considered as a deed; if it is in writing and defines the extent of the claim, it is a sign assemblance of claim of title. See *Street v. Collier; 45 SE 294; Mullans a Adm'r v Carper; 16 SE 527*; that strickly speaking it cannot rest in parol, See *Armijo v. Armijo; 4 NM (Gild.) 57, 13 Pac 92*.

The Grantees have hereunto set their hands and seals the day and year first above written.

Signed Sealed and Delivered _____

in the Presence of:

State: California           )
                            ) SUBSCRIBED AND SWORN
County: San Mateo           )

Subscribed and sworn to me this 27ᵗʰ day of the **September**
month in the year of our Lord two thousand and ten.

*Pls. see attached Jurat*

- page three of three -

**Ex. H**

# Jurat

State of California

County of San Mateo

Subscribed and sworn to (~~or affirmed~~) before me on this _____27th_____ day of __September__ ,

20__10__ by _____Lawrence Munar Asuncion & Maria Estrella C. Asuncion_____ ,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.



_____
Signature

R. R. HENRY-PERRIN
Commission # 1711327
Notary Public - California
San Mateo County
My Comm. Expires Dec 16, 2010

(Notary seal)

---

# OPTIONAL INFORMATION

---

### DESCRIPTION OF THE ATTACHED DOCUMENT

**Grant Deed**

(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages __3__   Document Date __09/27/10__

_____
(Additional information)

### INSTRUCTIONS FOR COMPLETING THIS FORM

*The wording of all Jurats completed in California after January 1, 2008 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one which does contain proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.*

- State and County inform ation must be the State and Cou nty wher e the document signer(s) personally appeared before the notary public.
- Date of notar ization must be the d ate that the si gner(s) per sonally appear ed which must also be the same date the jurat process is completed.
- Print the na me(s) of document signer(s) w ho per sonally appear at the tim e of notarization.
- Signature of the n otary public must match the signature on file with the office of the county clerk.
- The notar y seal im pression must b e clear and photogr aphically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.
    - ❖ Additional inform ation is not r equired but could help to ensur e this jurat is not misused or attached to a different document.
    - ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document

2008 Version CAPA v1.9.07  800-873-9865  www.NotaryClasses.com

*Ex. H*

— BACK PAGE OF PREVIOUS PAGE —

Ex. H

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of  California

County of  San Mateo

On ___27 September 2010___ before me,       R.R. Henry-Perrin, Notary Public,

personally appeared _____Lawrence M. Asuncion & Maria Estrella C. Asuncion_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) are   subscribed to the within instrument and acknowledged to me that they       executed the same in their       authorized capacity(ies), and that by their       signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> R. R. HENRY-PERRIN
> Commission # 1711327
> Notary Public - California
> San Mateo County
> My Comm. Expires Dec 16, 2010

_____                          (Notary Seal)
Signature of Notary Public

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

Grant Deed
_____
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages __3__ Document Date __09/27/10__

_____
(Additional information)

### CAPACITY CLAIMED BY THE SIGNER
- ☒ Individual (s)
- ☐ Corporate Officer
  _____
  (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document


Ex. H

BACK PAGE
OF
PREVIOUS PAGE -

Ex. H